# Illinois Official Reports

## Appellate Court

---

**Jackson v. Callan Publishing, Inc., 2021 IL App (1st) 191458**

---

| | |
|---|---|
| Appellate Court Caption | TALMITCH JACKSON and MICHAEL BYRNE, Individually and on Behalf of the Classes, Plaintiffs-Appellants, v. CALLAN PUBLISHING, INC., d/b/a Public Safety Services; SAFETY PUBLICATIONS, INC.; ADAM HERDMAN; ARTHUR OLIVERA; SALVATORE TRIVERI; JIMMIE KORONAKOS, a/k/a Jimmy Koronakos; and FRATERNAL ORDER OF POLICE LODGE NO. 7, Defendants (Callan Publishing, Inc., d/b/a Public Safety Services, and Fraternal Order of Police Lodge No. 7, Defendants-Appellees).– TALMITCH JACKSON and MICHAEL BYRNE, Individually and on Behalf of the Classes, Plaintiffs-Appellants, v. CALLAN PUBLISHING, INC., d/b/a Public Safety Services; JOHN CHENAULT, Individually and d/b/a Public Awareness, Inc.; MARK VALENTINE, Individually and d/b/a Public Awareness, Inc.; PUBLIC AWARENESS USA, INC.; RHONDA CHENAULT; DANILE DUGO; JUAN BROWN; ROBERT GENTILE; and FRATERNAL ORDER OF POLICE LODGE NO. 7, Defendants (Callan Publishing, Inc., d/b/a Public Safety Services, and Fraternal Order of Police Lodge No. 7, Defendants-Appellees). |
| District & No. | First District, Sixth Division No. 1-19-1458 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 03-CH-5765, 03-CH-10108; the Hon. Michael T. Mullen, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Michael Rothmann, Law Office of Martin L. Glink, of Arlington Heights, for appellants.<br><br>Marty J. Schwartz and Tyler Manic, of Schain, Banks, Kenny & Schwartz, Ltd., of Chicago, for appellee Callan Publishing, Inc.<br><br>Maureen A. McGuire, Christopher C. Heery, and Catherine O Suilleabhain, of Anderson, Rasor & Partners, LLP, and Ira N. Helfgot, both of Chicago, for appellee Fraternal Order of Police, Lodge No. 7. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.<br>Presiding Justice Mikva also specially concurred, with opinion, joined by Justice Oden Johnson. |

**OPINION**

¶ 1 This case concerns two civil actions by plaintiffs Talmitch Jackson and Michael Byrne against defendants including Callan Publishing, Inc. (Callan); Public Awareness, Inc., and Public Awareness USA, Inc. (Public Awareness); Safety Publications, Inc. (Safety Publications); and Fraternal Order of Police Lodge No. 7 (FOP). Plaintiffs' claims concerned alleged improprieties in solicitation of donations on behalf of FOP by Callan, Public Awareness, and Safety Publications (collectively, Telemarketers) including representing to donors that their donations would benefit FOP-member disabled police officers and families of FOP-member officers killed in the line of duty (collectively, the Class). On allegations that Telemarketers retained about 80% of donated funds and FOP used the remainder for purposes other than benefitting the Class, plaintiffs sought imposition of a constructive or charitable trust for benefit of the Class and damages for unjust enrichment. Following certification of the Class and a bench trial, the court found for plaintiffs against Public Awareness for $2,143,234.96 and against Safety Publications for $1,454,921.63, found for FOP and Callan, and declined to impose a constructive or charitable trust.

¶ 2 On appeal, plaintiffs contend that the trial court erred in (1) finding no agency relationship between FOP and Telemarketers or amongst Telemarketers, (2) not imposing a charitable trust, (3) finding no wrongful conduct by FOP and not imposing a constructive trust, (4) not finding that FOP and Callan breached their duties as trustees over the donations by wasting, mismanaging, and commingling funds, and (5) finding no unjust enrichment. For the reasons stated below, we affirm.

## I. JURISDICTION

Upon plaintiffs' March 2003 complaint in case No. 03-CH-5765 and June 2003 complaint in case No. 03-CH-10108, the trial court certified the plaintiff Class in 2006 and 2008 and held trial in 2018. The court issued its judgment on June 14, 2019, and plaintiffs filed their notice of appeal on Monday, July 15, 2019. Accordingly, this court has jurisdiction in this matter pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017) governing appeals in civil cases.

## II. BACKGROUND

In March 2003, plaintiffs filed their complaint in case No. 03-CH-5765 against FOP, Callan, Safety Publications, Adam Herdman, Arthur Olivera, Salvatore Triveri, and Jimmy Koronakos concerning solicitation of businesses. Herdman and Olivera were allegedly owners, directors, and officers of Safety Publications while Triveri and Koronakos were allegedly persons employed by Safety Publications as solicitors for FOP. In June 2003, plaintiffs filed their complaint in case 03-CH-10108 against FOP, Callan, Public Awareness, John Chenault, Mark Valentine, Daniel or Danile Dugo, Juan Brown, and Robert Gentile concerning solicitation of individual donors. Valentine and Chenault were allegedly owners, directors, and officers of Public Awareness, while Dugo, Brown, and Gentile were allegedly persons employed by Public Awareness as solicitors for FOP. Both complaints were subsequently amended.

Both complaints alleged that FOP contracted with Callan in June 2000 to solicit and collect funds, and the contracts allegedly gave Callan "proprietary use" of FOP's name for fundraising as well as authority to subcontract the fundraising. Callan hired Safety Publications and Public Awareness to perform some of the fundraising. Pursuant to these agreements, Telemarketers (including Triveri, Koronakos, Dugo, Brown, and Gentile) allegedly solicited donations from June 2000 onward on behalf of disabled officers, officers killed in the line of duty, and their wives, widows, and families without disclosing that their fee was about 78% of donations.

For 2001, Safety Publications reportedly raised $381,981.18 and charged fees and commissions of $297,945.36; for 2002 through the end of June, Safety Publications reportedly raised $179,423 and charged fees and commissions of $139,949.94. For 2001, Public Awareness reportedly raised $601,627.27 and charged fees and commissions of $483,301.83; for 2002 through the end of June, Public Awareness reportedly raised $404,347.81 and charged fees and commissions of $323,478.26. Plaintiffs alleged that Telemarketers raised additional funds that were not reported to the State as required by statute. Plaintiffs alleged that FOP spent little of its 22% on the Class on whose behalf the funds were raised, but upon golf outings, fishing tournaments, and political donations.

Plaintiffs alleged that they were disabled FOP-member police officers and thus members and suitable representatives of the Class. On allegations that donors made donations expecting that most of their donations would go to the Class but then little, if any, of the donations went to the Class, plaintiffs alleged that defendants breached their duty as trustees of the donations and sought an accounting, creation of a charitable or constructive trust on behalf of the Class, damages for unjust enrichment, and attorney fees and costs.

The record includes two agreements of July 1, 2000, between FOP and Callan. One is a "royalty and licensing agreement" providing Callan the "exclusive right to use [FOP's] name"

in soliciting advertising revenue for a newspaper in exchange for "royalties" to FOP of 18% of the first $100,000 of "collected advertising revenue" and 20% thereafter. The other agreement created a "sponsorship" program "of telemarketing contacts to the general public to procure sponsors of the FOP *** and to communicate a sponsor service message" and provided Callan "the right and license during the term hereof to use [FOP's] name in connection with [the p]rogram" in exchange for "royalty payments" to FOP of 22% of "collected sponsorship revenue." The sponsorship agreement provided that "[p]rogram materials will not be utilized by [Callan] or its contractors without the prior approval of FOP." Both agreements recited that FOP was "a membership and labor organization serving its members" rather than a charitable organization, Callan was an independent contractor and not an agent of FOP, FOP "understands and agrees that contractors secured by [Callan] will be permitted during the term of this Agreement to contact prospective" advertisers or sponsors, and no person or entity performing services regarding the newspaper or sponsorship program would be an employee or agent of FOP.

¶ 11                                    A. Pretrial Proceedings

¶ 12        In September and November 2003, the trial court granted motions to dismiss case No. 03-CH-5765 against Callan, Safety Publications, Herdman, and Olivera. The court found that the pleadings did not establish a fiduciary relationship between Callan and plaintiffs and, at most, plaintiffs may be able to enforce the contract between Callan and FOP, but plaintiffs did not allege a breach of that contract. The court also found that the Illinois Attorney General had exclusive standing to enforce the Solicitation for Charity Act (Charity Act) (225 ILCS 460/0.01 *et seq.* (West 2002)).

¶ 13        This court reversed the dismissals. *Jackson v. Callan Publishing, Inc.*, 356 Ill. App. 3d 326 (2005). "The central issues [were] whether plaintiffs' complaint alleged a legally cognizable wrong predicated on a fiduciary relationship against defendants Callan and Safety, and whether plaintiffs have the standing to complain." *Id.* at 332. We noted that "[t]he parties do not dispute the existence of a fiduciary relationship between the FOP and plaintiffs, as they were members of that fraternal organization," but "this appeal is concerned with whether plaintiffs may maintain their action against Callan, retained as an independent contractor by the FOP, and Safety, Callan's subcontractor." *Id.*

¶ 14        We found that plaintiffs sufficiently alleged the elements of charitable trust formation by alleging that Callan and Safety Publications represented to the public that they were soliciting funds on behalf of members of the Class so that a trier of fact could reasonably infer that people did not buy "sponsorships" as the contract recited but intended to make donations to the Class. *Id.* at 332-33. Whether Callan and Safety Publications were themselves trustees or intermediaries for FOP as trustee was an issue of fact to be determined by donor intent. *Id.* at 334.

¶ 15        We also found that plaintiffs' claims were not preempted by the Charity Act, nor did plaintiffs lack standing, because members of a class of beneficiaries of a charitable trust have a right to enforce the trustee's fiduciary duties, preexisting the Charity Act "by centuries" and distinct from the public interests and regulatory duties to be enforced by the Attorney General. *Id.* at 335-37. However, we remanded for the trial court to determine whether the Attorney General fully and adequately represented plaintiffs' interests in litigation regarding the FOP-Callan contract that the Attorney General commenced against Callan, Safety Publications,

- 4 -

Herdman, and Olivera in November 2002 and settled before we issued our opinion. *Id.* at 330, 337-42. If so, then plaintiffs and the Attorney General were sufficiently in privity that plaintiffs' complaint would be barred by *res judicata*. *Id.* at 337-42. If not, the trial court was to determine if the settlement agreements in the Attorney General litigation rendered plaintiffs' complaint moot. *Id.* at 342-43.

¶ 16     Following remand, the trial court found that the consent decrees did not provide plaintiffs with a monetary recovery as they sought in the instant litigation so that the Attorney General litigation and the settlement agreements therein did not render the instant litigation moot.

¶ 17     The trial court did not formally consolidate the cases but for judicial economy combined them for discovery and trial. The Class was certified in the two cases in December 2006 and December 2008, with plaintiffs as class representatives for FOP-member disabled officers and wives and families of FOP-member officers killed in the line of duty from March 27, 1998, onward. The complaints as amended survived cross-motions for summary judgment.

¶ 18     In June 2009, plaintiffs moved to find Public Awareness, Chenault, Valentine, Dugo, Brown, and Gentile in default, as their counsel had been discharged and no new counsel had appeared. The court granted the motion, but in August 2009, the court vacated the default against Public Awareness and Valentine and allowed new counsel to appear for them.

¶ 19     When their counsel withdrew in May 2011 and no new counsel appeared for them, Safety Publications, Herdman, and Olivera were found in default in August 2012 with their answer "stricken and confessed against them." However, they filed motions to vacate the default and file appearances in September 2012, which the court granted in October 2012. Safety Publications reappeared with counsel while Herdman and Olivera reappeared *pro se*. Counsel for Safety Publications was allowed to withdraw in May 2018 upon a motion alleging that Safety Publications had been dissolved as a corporation by the Secretary of State in November 2017 and noting that Herdman and Olivera had each appeared in his own right. In August 2018, the court found Safety Publications in default, with proveup reserved for trial, in an order striking out proposed language that Safety Publications admitted and confessed the allegations of the latest amended complaint.

¶ 20     In July 2018, the court approved notice to the Class and allowed plaintiffs to publish it.

¶ 21                                   B. Narrowing of Claims

¶ 22     In their third amended complaints, plaintiffs clarified that they were seeking both a constructive trust and a charitable trust against FOP, damages for unjust enrichment from FOP, both a constructive trust and charitable trust against Callan, damages for unjust enrichment from Callan, a constructive trust against Callan arising from FOP breaching its fiduciary duties to plaintiffs, constructive trusts and charitable trusts against Safety Publications and Public Awareness arising from each breaching its fiduciary duty to plaintiffs, constructive trusts against Safety Publications and Public Awareness arising from FOP breaching its fiduciary duties to plaintiffs, and damages for unjust enrichment from Safety Publications and Public Awareness.

¶ 23     The court partially granted motions to dismiss the third amended complaints, finding that plaintiffs had to allege facts showing a preexisting fiduciary duty by FOP to plaintiffs to state a claim for a constructive trust against FOP; that is, FOP's retention or use of the funds raised must have breached some duty to plaintiffs for FOP to become a constructive trustee of those

funds. However, because a charitable trust does not require a preexisting fiduciary duty, the charitable trust claim against FOP would stand, as would the other claims in the third amended complaint.

¶ 24 In their fourth amended complaints, plaintiffs added allegations to the constructive trust claim against FOP. Plaintiffs and the Class were FOP members, and FOP was "the fraternal organization represent[ing] Plaintiffs' interests," with a fiduciary duty to plaintiffs and an "obligation to treat all its members, including Plaintiffs, without hostility and with complete good faith and honesty, and to avoid arbitrary conduct." FOP allegedly used its position relative to plaintiffs to raise money for plaintiffs, draft letters under FOP letterhead signed by FOP presidents that were sent to the public, and "manipulate the public into donating money to benefit Plaintiffs."

¶ 25 FOP filed a motion to dismiss the fourth amended complaints. In their response, plaintiffs argued that FOP "raising the money for Plaintiffs was not wrongful since FOP had the right to do so," but its retention and use of the funds for other than the intended purposes of benefiting plaintiffs was wrongful. The court granted the motion to dismiss as to the constructive trust claim against FOP. The court found that FOP is not a union but a collective bargaining representative with its only duty to its members being fair representation. The trial court noted this court's earlier opinion herein (*Jackson*, 356 Ill. App. 3d 326) but found that "the appellate court assumed the existence of a fiduciary relationship as a matter of law between the FOP and Plaintiffs, an assumption that may not be warranted as the FOP was not heard on this issue before the appellate court as it was not a party to the appeal." The trial court contrasted plaintiffs' argument that FOP's wrongdoing lay in how it spent the funds against allegations in the complaint as amended that defendants made false and misleading representations to the public to induce donations.

> "The entire gravamen of the Fourth Amended Complaint is that the *fundraising itself* was wrongful because the donors were being deceived *at the time the funds were being raised* into believing that the funds were going to be distributed to Plaintiffs rather than being told the truth, *i.e.* that Callan was going to get a 78% fee and that the FOP would use the money raised for its own purposes." (Emphases in original.)

The court granted plaintiffs leave to amend the complaint regarding their constructive trust claim against FOP.

¶ 26 Plaintiffs filed their fifth amended complaints, adding to the constructive trust claim against FOP allegations that a "purpose of the FOP is to assist disabled officers and families of officers killed in the line of duty," that FOP "had the ability to and in fact, did, raise money for its disabled officers and families of officers killed in the line of duty," and that the FOP constitution created an "obligation to create a tradition of 'esprit de corps' of solidarity, and of fidelity among its members, including between Plaintiffs and the FOP."

¶ 27 The court partially granted a motion to dismiss the claims against FOP in the fifth amended complaints, finding that plaintiffs still had not pled facts showing FOP had a fiduciary duty to plaintiffs, including that the FOP constitution did not establish such a duty.

> "It appears that Plaintiffs touch upon facts that would seem to indicate actual fraud, *e.g.* allegations that, at the time the FOP entered into agreements with Callan, that the FOP knew that it would not use the donated money to benefit Plaintiffs, but the allegations seem to stop short of allegations of actual fraud. To the extent that Plaintiffs imply that they are (or were at all relevant times) in a principal-agent relationship (and therefore

a fiduciary relationship) with the FOP, Plaintiffs need to allege specific facts in support of an agency relationship."

Plaintiffs would have an opportunity to plead a constructive trust as to FOP. The court rejected arguments that unjust enrichment and charitable trust claims against FOP were similarly defective, as allegations that FOP had a fiduciary duty to plaintiffs had been removed from those claims.

¶ 28 Plaintiffs filed their sixth amended complaints alleging in the constructive trust claim against FOP that "FOP has stated to its members and to the public that 'We pledge ourselves to promote the health and welfare of all Chicago Law Enforcement Officers and their immediate families,' " that "one way the FOP promoted the health and welfare of Plaintiffs and the class they represent was to raise funds for them," and that an FOP bylaw provided that one of FOP's purposes was to "serve our members in time of sickness or distress and to lend such assistance that will aid their speedy recovery and tend to diminish their misfortune." FOP by its constitution and bylaws "held out to the public that the FOP could act on their behalf," and FOP "advised the public that they ran programs to assist Plaintiffs and the class they represent," and "held itself out to the public as being the agent of the class of Plaintiffs for this fundraising program." FOP was aware that Telemarketers "were telling the public that the money would be used to benefit Plaintiffs," a "reasonably prudent person, exercising diligence and discretion, would naturally assume that the FOP had the authority to raise funds and benefits for Plaintiffs and the class they represent," and "FOP was the actual, apparent and/or implied agent of Plaintiffs for the *** program FOP initiated and conducted on their behalf."

> "FOP was in a position of superior knowledge as to the fundraising program since the FOP was the one interacting with the defendant telemarketers and public, the FOP controlled what could and what was being represented to the public as to the purpose of the funds, the FOP was the one contracting and authorizing payments to the telemarketers, the FOP was the entity reporting the fundraising program to the State of Illinois, the FOP was the one which knew the details and amounts of donations being made and the FOP was the one which controlled the bank accounts in which the funds would be deposited."

Therefore, "whether as Plaintiffs' representative, agent or by its voluntary assumption, FOP had a fiduciary duty to Plaintiffs."

¶ 29 The court partially granted motions to dismiss the sixth amended complaints, dismissing with prejudice (1) the constructive trust claim against FOP and (2) the constructive trust claim against Callan for FOP's alleged breach of fiduciary duty on the basis that plaintiffs still had not pled facts showing FOP had a fiduciary duty to plaintiffs. While plaintiffs had not objected to FOP fundraising on their behalf, no facts alleged in the complaint showed that they had consented to it or even been aware of it when it was occurring, so FOP could not be plaintiffs' agent. Also, not all Class members were FOP members and so had no relationship with FOP, much less an agency relationship. The language in the FOP constitution and bylaws cited by plaintiffs was aspirational rather than defining any rights or responsibilities between FOP and plaintiffs. As to the allegation that FOP voluntarily undertook to be a fiduciary for plaintiffs, a fiduciary relationship exists when one party places trust in another party who accepted the trust. However, as stated above, there was no allegation that plaintiffs knew of the fundraising when it was occurring, much less placed trust in FOP regarding fundraising. Lastly as to fraud, one element of fraud is that a plaintiff must rely to his or her detriment on a false statement,

but plaintiffs did not allege facts showing their knowledge of the fundraising statements nor their reliance on the statements.

¶ 30                                        C. Motions *In Limine*

¶ 31       FOP filed motions *in limine*, seeking to bar plaintiffs from using or presenting (1) affidavits as substantive evidence at trial, (2) default judgments against Safety Publications and Public Awareness as implied evidence of wrongdoing by FOP, and (3) evidence regarding a 2002 television news investigation of telemarketing practices. Using affidavits in lieu of calling the affiants as trial witnesses would deprive FOP of the opportunity to cross-examine them. Using "admissions or evidence adduced from the default judgments, entered against co-defendants, as substantive evidence against FOP would be improper and unduly prejudicial." Regarding the news investigation, FOP sought to bar video and transcripts of the news segment and a website description of the story resulting from the investigation. FOP argued that the investigation and segment were irrelevant, as they concerned telemarketers using convicted felons as solicitors, and double hearsay as both the news segment and the statements therein were hearsay.

¶ 32       Plaintiffs responded, arguing that the affidavits were proper evidence of the state of minds of affiants, bases for expert opinions, and impeachment. Regarding the effect of defaults, plaintiffs argued that FOP's propositions and case law were inapplicable "in cases involving agency and/or charitable trust" and that its motion was unduly vague as to what evidence FOP was seeking to bar. "Default judgment against an agent does not preclude[ ] recovery against the principal, unless the agent satisfies the judgment," and plaintiffs argued that Callan was FOP's agent and Safety Publications and Public Awareness were Callan's agents and FOP's subagents. Also, under the charitable trust claims,

> "[o]nce default judgment is entered, Plaintiff[s] will be able to follow the money through all parties, eventually leading the court to FOP, who *** was most likely the sole trustee of all the funds and as such was responsible to manage all of the funds for the Classes. It matters not that Callan had possession of the funds and it was Callan that distributed the funds - it was FOP's duty to ensure the funds were managed for the proper purposes."

¶ 33       FOP also filed motions *in limine* to bar plaintiffs from (1) referring to the Charity Act, as that statute is publicly rather than privately enforced; (2) referring to the Attorney General cases to which FOP was not a party, as unduly prejudicial and irrelevant; and (3) presenting evidence or argument that the contracts between FOP and Callan, Callan and Public Awareness, and Callan and Safety Publications were improper, as irrelevant. The terms of the FOP-Callan contracts "cannot be challenged by Plaintiffs to establish that any money retained by Callan, as their fee for running the FOP's fundraisers, were excessive" because the "apportionment of Callan's fees *** has no relevance to any issues in the case," such as donor intent to benefit the Class rather than FOP and its members generally.

¶ 34       Plaintiffs responded that FOP and Callan were interposing the consent decrees in the Attorney General cases for affirmative defenses of *res judicata* and collateral estoppel and thus should not be able to bar plaintiffs from using them, violations of the Charity Act would render the contracts void even if that statute is not privately enforceable, the terms of the contracts were not irrelevant as FOP argued, and barring any evidence or argument of the impropriety of the contracts was unduly vague. FOP's argument "that the 80% fee was taken out before

FOP received its share therefore FOP cannot be held responsible for the 80% is baseless"; that is, by "paying 80% to the telemarketers without blinking an eye and without ever auditing the programs to ensure the reported expenses were accurate (which they were not), FOP breached its duty."

¶ 35    Plaintiffs also filed a motion *in limine* to declare the aforesaid contracts void *ab initio* and bar witnesses from reliance on the contracts at trial. Plaintiffs argued that the import of section 7 of the Charity Act (225 ILCS 460/7 (West 2002)) is that FOP had to contract directly with Safety Publications and Public Awareness as professional fundraisers, not with Callan, which is not a professional fundraiser, which then contracted with Safety Publications and Public Awareness. As FOP did not do so, the contracts were void *ab initio* and cannot be relied upon.

¶ 36    At the hearing *in limine*, the court granted FOP's motion to bar use of affidavits as substantive evidence, noting that an affidavit can be used in impeachment but requires a witness for its admission and that an expert witness's reliance upon an affidavit in forming an opinion does not render the affidavit substantive evidence. As to barring use of defaults as evidence, the court denied FOP's motion in part and reserved its decision regarding agency. As to FOP's motion to bar evidence of the news investigation, plaintiffs had no objection, and the court granted it.

¶ 37    As to FOP's motion barring plaintiffs from presenting evidence or argument that the contracts were improper, and plaintiffs' motion to find the contracts void and bar witnesses from relying upon them, the court denied plaintiffs' motion. While plaintiffs could argue the propriety of the contracts, the court would not find the contracts void *ab initio* or bar defendants from relying on them. The court denied FOP's motions to bar evidence of the Charity Act and the Attorney General cases, finding that plaintiffs could argue the Charity Act as a standard of care and that the court would give due weight to evidence regarding the Attorney General cases.

¶ 38    As to other motions by plaintiffs, the court reserved its ruling on finding Public Awareness's "non-answer" to plaintiffs' requests to admit and Chenault's affidavit to be judicial admissions, and it found that the discovery deposition of John Bill, vice president and treasurer of Callan, was an evidentiary admission but not a judicial admission.

¶ 39    Just before trial commenced, the court ruled on plaintiffs' motion to deem defaults and admissions by some parties to be judicial admissions applicable to all defendants rather than evidentiary admissions applicable only to those particular parties. The court found that the default of some defendants does not relieve a plaintiff of the necessity of establishing its case against defendants who appeared and pled and granting plaintiffs' motion would improperly hold defendants who appeared and pled to a higher burden due to inaction by codefendants beyond their control. The court expressly noted agency to be a disputed issue. The evidence would be admitted and its significance or weight could be argued, but it would not be inherently binding on defendants other than those who defaulted or made the admissions.

¶ 40                                    D. Trial

¶ 41    At the October 2018 trial, the parties stipulated that plaintiffs were disabled police officers and FOP members, FOP is the exclusive collective bargaining representative of Chicago police officers and provides members "a legal defense fund, legal services and legislative representation," and FOP did not segregate any portion of the donated money into a fund for

the exclusive use and benefit of plaintiffs.

¶ 42                                        1. FOP Officials

¶ 43        Mark Donahue testified to being FOP's president and financial secretary at various times. FOP represents both on-duty and disabled officers who are FOP members and thus is required to provide its services and benefits to its members honestly and in good faith and to act in the best interest of disabled members. Member dues entitle them to legal defense, collective bargaining, newsletters, insurance protection, and other benefits, including having "attorneys represent them in front of the pension board for duty disability hearings." Counsel for pension hearings and life insurance for members are paid for from the membership fund rather than the general fund. Golfing, fishing, and conventions were not FOP programs as such, but the national convention or conference was necessary for FOP's relationship with the national organization including electing officials, and the golfing and fishing tournaments promoted fraternalism among FOP members. FOP also made political donations. It was Donahue's duty as president "to deal honestly with the funds that were collected by the FOP."

¶ 44        As financial secretary, Donahue was not in charge of dues coming in and thus could not answer whether dues go into the membership account. Money from Callan went into the general fund. FOP account books were kept in the ordinary course of business and would be produced at FOP board meetings and if any FOP member asked to see them. The accounts were entered into evidence. While Donahue denied personally receiving any of the funds raised by Callan from 1998 to 2003, FOP accounts showed that he received from the general fund during those years payments of $5000, $1500, and $360. Donahue could not explain at trial why a tour company was paid $8680 from the general fund for national conference expenses, and he presumed that $12,000 paid to FOP officials was for *per diem* dining and travel expenses for the national convention. The accounts also reflected paying legislative counsel from the general fund and expenses at two clubs, but the primary source of funds for the golf and fishing tournaments was fees. The accounts showed that FOP's counsel from 1998 to 2003 was paid a little over $292,000, and he believed counsel represented FOP honestly.

¶ 45        Donahue opined that FOP officials "cannot take advantage of the status of duty disabled officers or families of officers killed in the line of duty to benefit themselves personally." He believed that an FOP member could be disciplined for misappropriating, wrongfully handling, or failing to account for FOP funds, but it was not against FOP bylaws to use FOP's name or logo for soliciting or advertising "within limits." When shown a provision in the FOP constitution that using the FOP name or logo "for soliciting funds or advertising and similar activities except as provided elsewhere in the constitution and bylaws" is prohibited, and asked where that authority was provided, Donahue replied "I can't say where" specifically but FOP is authorized to promote fraternalism between FOP and its members and the community. Other rules authorized such use more specifically, but Donahue did not have them at hand.

¶ 46        As FOP president, one of Donahue's responsibilities was to "negotiate with third parties for the best results of its members," including disabled officers and families of deceased officers. When asked "if FOP, through its telemarketers, were calling the public and businesses and telling them that donations were being raised for duty disabled officers and families of officers killed in the line of duty, you as a president should have created an account for them?" he answered. "If there were funds explicitly raised for a certain purpose, the probability of a separate fund to which those monies were put in to—it would have been a possibility," and he

would have considered it had he known Telemarketers were raising funds for disabled officers and the families of deceased officers.

¶ 47 Donahue identified two letters prepared for the fundraising campaigns, one he signed and the other signed by William Nolan, another FOP president. (As the letters are nearly identical, we shall refer to them collectively as the Letter.) The Letter advised donors of the programs FOP provides its members, including that "police officers and their families live each day with the harsh realities of crime prevention and criminal apprehension. The Chicago FOP attempts to alleviate those concerns for Chicago officers through a legal defense fund, AD&D insurance, line of duty death benefits, legal services, and legislative representation." The Letter did not state that the funds raised would benefit all FOP members nor that it would be spent on golf and political donations, but Donahue opined that political donations were referenced under legislative representation. Donahue acknowledged that the harsh realities referenced in the Letter include death and disability. The Letter also stated that a substantial portion of donations would go to administrative costs but did not state that only 20% would go to FOP. "Only the space" precluded saying so in the Letter, and Donahue denied that the Letter did not mention the percentage because it would discourage donation. Donahue opined that "I don't know that I would be upset" if he donated to, for instance, a medical charity but 80% of donations went to the solicitors and the remaining 20% did not go to the patients, but he would have wanted his donation to go to the stated cause. While the Letter stated that the funds raised would go into a general fund, it did not state how the general fund would be spent. Donahue did not recall approving the letter he signed, and he did not recall when the Letter was drafted, as both letters were undated. FOP had contracts with Callan, predating Donahue's presidency, rendering Callan responsible for the Letter's contents. At first, Donahue testified that he did not believe he could ask Callan to correct the Letter if he disagreed with something in it, but then said that he could.

¶ 48 Donahue did not know that Callan had subcontracted with Safety Publications or Public Awareness, and he did not recall signing a government filing to that effect. When shown annual reports and forms filed with the Attorney General, Donahue acknowledged his signatures thereon, and the reports and forms were entered into evidence. The reports and filings reflected that FOP raised $203,253 in 2002 and $116,873 in 2003 and referred to paid fundraisers and consultant activities, but it was Donahue's understanding that Callan was using fundraisers. When asked why one of the filings stated that FOP was not using a professional fundraiser, Donahue replied that Callan was not a fundraiser but produced periodicals. The filings stated that money raised by Callan would be spent on golfing and political donations, but Donahue denied knowing while he was FOP president that funds raised by Callan would be spent on golfing, fishing, conventions, and political donations. He learned that some but not all of the money from Callan was spent in that manner. When asked if he knew what the Charity Act required of FOP, he answered that FOP "hired a very competent accounting firm to handle those issues for us and then entrusted those individuals to ensure that they were up to snuff on the requirements." Donahue did not request an accounting from Callan or the Telemarketers, nor did he review the Telemarketers' records, and he signed filings prepared by the accounting firm.

¶ 49 Donahue did not know that "the telemarketers were calling the donors and telling them that FOP was raising money for disabled officers and families of officers killed in the line of duty when" the Letter was sent; that is, from 1998 to the end of 2003. He was told of such allegations

in a television news interview in November 2002, and FOP board meetings in November 2002 and January 2003 referenced the interview. He could not recall if he watched the interview when it was aired. He acknowledged stating in the interview that FOP was doing all it could for disabled police officers but could not recall saying that a special fund would be established for the fundraising money, saying instead that the "money goes to all members."

¶ 50    Donahue could not recall when he learned of allegations that of $5 million solicited for injured police officers, only $1 million went to FOP and some injured officers were claiming that they requested assistance but received none from FOP. He could not recall Allan Barski warning him that the solicitors were telling donors "that the money would be used to benefit disabled officers, widows, and orphans." He could not recall when he learned of the Attorney General's suits against Callan, Public Awareness, and Safety Publications. When asked if he knew Callan was still fundraising for FOP through the end of 2003 despite the November 2002 interview, he replied "Callan was honoring the contract." He acknowledged that an FOP member stated at a January 2003 FOP board meeting that a merchant told her that "they called and asked for money using disabled officers and deceased officers stating they would get the money." He could not recall if he ever called Callan during 2003 to ask it to stop telling donors that donations would benefit the Class. He believed the funds raised by Callan appropriately went to the general fund.

¶ 51    On cross-examination by Callan, Donahue testified that the Letter stated in part that FOP is "a nonprofit membership organization and elected representatives of" Chicago police officers but "not a charitable organization and does not solicit support for any other charitable, benevolent, philanthropic, patriotic, or eleemosynary organization for its purpose." Donahue understood that charities incur expense in fundraising, and he never asked any solicitor for charity who called him what percentage of donations went to expenses.

¶ 52    On cross-examination by FOP, Donahue testified that FOP first contracted with Callan before Donahue was FOP president, when Nolan was president. Donahue did not know whether Nolan obtained permission from the national organization to use the FOP logo in the Callan campaigns, nor to his knowledge did the national organization complain of such use. He had no reason to terminate the Callan contracts when he was president, believing Callan was doing a good job due to the "lack of complaints" and the quality of the newspaper it produced. The money Callan paid to FOP would not have come to it but for Callan's work. Donahue did not recall ever reading the Callan contracts. He saw nothing objectionable in the Letter when he signed it or at trial.

¶ 53    When Donahue answered that he did not receive funds raised by Callan, he presumed his FOP salary and reimbursement of expenses did not come from donations. The $5000 expense was for Donahue's campaign to be an officer of the state organization, and FOP's board approved reimbursement for the $5000, $1500, and $360 expenses mentioned in direct examination. FOP funds all went into the general fund and then were distributed to other funds including the membership fund, except for one restricted account for legal defense. The filings and reports with the Attorney General were prepared by an accounting firm, based on FOP records, and only signed by Donahue. FOP donates to other organizations and pays the dues of disabled members. Membership dues are FOP's primary revenue and entitle all members to the benefits in the FOP bylaws. The bylaws expressly authorize the FOP president to interpret the FOP constitution and bylaws subject to review by the board. When Donahue was president, he acted for the FOP without board approval only on "daily operations" and obtained board

approval whenever it was needed. The FOP is a fraternal organization organized for the benefit of its members, who are Chicago's active, disabled, and retired police officers, and the members elect the board and president. The board and treasurer managed FOP funds and assets, and Donahue was never treasurer.

¶ 54     On redirect examination, Donahue testified that he did not know if FOP's charitable donations and payment of disabled member dues were paid from the general fund, except to the extent that all money goes first into the general fund.

¶ 55     John Capparelli testified to being FOP financial secretary from 1998 to 2001 and treasurer from 2001 onwards. As treasurer, he received funds from Callan under the two campaigns, decided where those funds would be placed, and could segregate FOP funds into special accounts with board approval. However, he did not believe he was responsible for accounting for the donations raised by Callan. He was unaware of any documents that would show how FOP spent the money from Callan. Except for special accounts for a political action committee and legal defense, all money first went into the general fund for distribution. Life insurance, accidental death and disability (AD&D) insurance, and collective bargaining were paid for from the membership fund. Beyond generally putting money where it was needed between the general and membership funds, he could not say whether donations raised from 1998 to 2003 were placed in the general fund.

¶ 56     Capparelli acknowledged an FOP bank account during the relevant period, which showed in relevant part a May 2003 check from Callan. Money from Callan went into an account linked to FOP's mortgage on its offices, which was paid off between then and trial. Capparelli denied transferring money from Callan to the membership fund but testified in a deposition that money was transferred from the sponsorship solicitation program to the membership fund to pay expenses. Money from either the general or membership fund was spent on golf and fishing tournaments and retirement parties. During Nolan's presidency, a tour company was paid for travel of FOP officials to a national conference. Capparelli did not know whether funds from Callan had been raised by Safety Publications or Public Awareness, nor once FOP received them how they were spent.

¶ 57     Capparelli acknowledged his signature on filings with the Attorney General that did not disclose Callan as a professional fundraiser, but he explained that he did not consider Callan a professional fundraiser. Also, the filings were prepared by FOP's accounting firm from reports by Callan, and Capparelli then signed the filings as true and correct. He had never read the Charity Act nor discussed with anyone FOP's duties thereunder. He relied on the accounting firm to handle such matters, as he had no accounting experience as a full-time police officer and elected FOP treasurer. He signed one of the filings in 2004, attesting that the contents were true and correct, after the instant cases had been filed.

¶ 58     Capparelli was also aware of the November 2002 television news investigation but denied that it was about FOP raising money through telemarketers for disabled officers or misappropriating funds intended for disabled officers. After November 2002, he did not audit Callan's reports or accounts, leaving that to the accounting firm, nor were FOP's procedures regarding Callan changed. He acknowledged being at a January 2003 board meeting but could not recall whether the Telemarketers were discussed. While separating the general fund for better accountability was discussed at that meeting, the meeting concerned the budget. Capparelli received no complaints between 2001 and 2003 about fundraising for disabled officers, and he believed he was responsible for the money FOP received from Callan but not

the money Callan kept. While he was aware of some complaints about the Telemarketers, he did not know if they were about FOP or another organization. He never went to the Telemarketers' facilities to investigate their operations nor did he discuss with Donahue putting money from Callan into a separate account.

¶ 59 On cross-examination by Callan, Capparelli testified that money from Callan was not spent specifically on golf or fishing tournaments but went into the general fund from which various expenses were paid. He had no reason to doubt Callan's reports nor the Attorney General filings based on them. He believed FOP was paid a percentage of funds raised by Callan, but he did not recall the exact percentages as he did not negotiate the contracts. He agreed with the representations in the Letter that FOP is a nonprofit membership organization representing police officers, officers and their families deal with the harsh realities of law enforcement, FOP attempts to address those realities with benefits for all members including legal defense, insurance, and legislative representation, and a substantial share of the funds raised would cover costs with the remainder paid to FOP's general fund.

¶ 60 On cross-examination by FOP, Capparelli testified that he had a letter from Bill to the effect that FOP was not obligated by the Charity Act to file with the Attorney General and its filings were voluntary. Capparelli believed FOP made the filings to receive a liquor license for its offices. There was no particular reason why the general and membership funds were two accounts, nor why money went into one fund or the other, as expenses are paid from either fund as the board approves. In Capparelli's experience as a police officer, the harsh realities of law enforcement referenced in the Letter are not limited to death or disability. Collective bargaining and representation in disability hearings are provided for or available to all members.

¶ 61 Allan Barski testified that he was elected FOP treasurer from 1993 to 2002 when Nolan was FOP president. He knew Callan to be "the solicitor for *** our newspaper and our solicitation" and knew Valentine as the person "in charge of the solicitation for Callan." He visited a Callan call center while treasurer. He acknowledged in his deposition testimony, but did not personally recall, that he discussed with Callan about sending undercover officers into the call center run by Herdman and Olivera (that is, Safety Publication's call center). From when he became treasurer, he received frequent complaints about FOP fundraising by "different organizations that were soliciting" or "conmen on the street that were soliciting by phone and then going into businesses and *** homes, collecting" so that it was "open season for solicitation for widows and orphans." He received "a couple" of complaints about Callan and its contractors soliciting for "widows and orphans and disabled," which he investigated. Of the various complaints Barski received, only three or four traced back to Valentine (that is, Public Awareness).

¶ 62 Barski's investigations consisted of speaking with persons claiming to have been solicited for disabled officers or the families of deceased officers, gathering the documents they were sent by "Valentine and his crew" showing FOP's contact information, and telling Valentine to fire the solicitors responsible. Conversely, if a person named a solicitor but Valentine said he had no solicitor by that name, "that would be the end of it." When Barski told Valentine to fire solicitors, Valentine demurred but Barski insisted. When he later called Valentine to confirm a firing, Valentine confirmed it.

¶ 63 Barski mentioned the telemarketing complaints to other FOP officials, including Nolan, at meetings between 1998 and 2001. At first, Nolan told him to "handle it" and then told him to

- 14 -

pass on complaints to Nolan and he would address them. Nolan told him to "back off," albeit not "in those words." Barski did not know whether Nolan then took further action. FOP's counsel was aware of the complaints from the meetings but never discussed them with Barski. Barski discussed the complaints with Callan two or three times but could not recall what Callan's reaction was. Barski did recall going to Callan's offices to prepare a script for solicitors to ensure no misrepresentations would be made.

¶ 64    The money raised by Callan for FOP was spent on various things unrelated to the membership account, including a golf outing, a picnic, conferences and conventions, and seminars. Looking at FOP accounts, Barski acknowledged a payment to a city club, explaining that FOP officials would take officials of the state or national organizations to dinner when in Chicago.

¶ 65    On cross-examination by Callan, Barski testified that he had seen the FOP-Callan contracts and the scripts used by Callan's contractors. However, he never saw "any documentation or contracts in which the FOP hired Callan or Callan hired subcontractors to solicit money on behalf of disabled police officers or *** family members of police officers killed in the line of duty," nor did he authorize Callan to solicit funds for them. Callan's contractors never said that they were authorized to solicit funds for disabled or deceased officers. He believed Callan did the best job it could and was not aware of any breaches of contract or improprieties by Callan. The complaints he received were not leveled against Callan. When he went to Callan's offices to prepare the script, he did not ask to see Callan's accounts because he had full reports from Callan every month. If he believed Callan was responsible for misleading solicitations, he could not terminate the contracts with Callan but would have taken the matter to the FOP board.

¶ 66    The other FOP officers were aware of Barski's strong stance against misleading solicitations. When he discussed the complaints with Nolan and said he would take care of them, Nolan did not tell him to ignore the complaints or accept the donations regardless. When he verified a complaint, he told the complainant not to donate so he was not aware of any verified complaint resulting in a donation. Many of the complaints he investigated concerned public safety organizations other than FOP or solicitors claiming to actually be police officers. He discussed complaints with Valentine directly and also told Callan to tell Valentine to "knock it off."

¶ 67    On cross-examination by FOP, Barski could not recall when he told Callan to call Valentine. When asked if any FOP official ignored complaints about misleading solicitations or told him to investigate, he replied that he was so angry about such solicitations that nobody else had to tell him to take them seriously. He clarified that when Nolan told him to back off, he was not telling him to ignore complaints but to not be so angry about them.

¶ 68    Portions of Nolan's deposition were entered into evidence. When asked if he could determine how the money provided by Callan to FOP and placed in the general fund was spent, he answered "[s]trictly for our political action fund and for the convention conference that we sent members to, anything that we could not use membership money for," such as political donations. When asked why FOP made filings with the Attorney General, Nolan replied "[o]n legal advice on that of our accountants." Nolan believed that Callan and its contractors could not "officially" change the scripts or brochures sent on FOP's behalf without FOP authorization.

¶ 69    At FOP's behest, the court admitted portions of Nolan's deposition. As FOP president, he could not have asked Callan for the names of solicitors on FOP campaigns so that FOP could

conduct background checks. The purpose of Nolan reviewing the scripts was to "make sure the script was in accordance with the contract we signed." When asked why the scripts did not mention the Telemarketers' percentage of donations, he replied "We gave them the script to follow as it was written and approved." When asked if he ever discussed with Telemarketers whether they would advise potential donors that the solicitors were telemarketers, he replied again that they "were to use the script as written." FOP did not hire the solicitors. The money FOP received from Telemarketers on the FOP campaigns was placed in a general fund rather than a separate account.

¶ 70                                   2. Callan

¶ 71        James Callan (James) testified to being president and secretary of Callan from before 1980 to 2014. Bill was the only other officer of Callan—vice president and treasurer—between 1998 and 2003. Callan provided services to FOP since the mid-1990s, selling ads to publish periodicals and fundraising from individuals. "We didn't actually provide the solicitation, but we were charged with the responsibility of getting that job done," so Callan contracted with Public Awareness for newspaper advertising solicitations and Safety Publications for individual solicitations from 1998 to 2003. Both were independent contractors.

¶ 72        When asked if representations by Safety Publications and Public Awareness on behalf of FOP had to be approved by FOP, James replied that scripts were prepared and provided to both contractors. While FOP would be familiar with the scripts, each conversation with a donor was not approved. FOP did not have to approve the scripts "but we would submit them certainty to make sure that in their mind it was accurate and that if they had any objections to them, we would certainly try to be responsive to that and correct them so they're consistent to whatever objections they might have." If FOP requested a change to the scripts, Callan would accommodate it, but James did not consider that to be FOP having approval of the scripts. If FOP had requested changes to the Letter, Callan would not "necessarily" have changed the Letter.

¶ 73        FOP gave Callan, and thereby Safety Publications and Public Awareness, the right to use its name for advertising and donation solicitation pursuant to the contracts. FOP would have contacted James about what Safety Publications and Public Awareness could say, and he may have had such discussions with FOP treasurer Barski. Callan "had the authority to advise" Public Awareness and Safety Publications to accurately describe the relationship with FOP and provided them guidelines to ensure their representations were accurate. If those guidelines were violated, Callan would discuss the matter with the contractor's management and, if the violation were serious, would ask the contractor to not use that solicitor on the FOP campaign. When asked if FOP had the authority to inspect the call centers of Public Awareness and Safety Publications, James replied that Callan had no objection to FOP doing so. He denied that Barski conducted an onsite inspection of Public Awareness and Safety Publications facilities, clarifying that he inspected one location of Safety Publications. While James "would hope" FOP would bring issues with the solicitation campaigns to him, he did not know if they had or would. If FOP had complained about solicitation practices at Public Awareness or Safety Publications, and the allegations were borne out, Callan would have asked for the solicitor in question to not be used. It was "probably true" that Callan would not have used Public Awareness or Safety Publications had FOP advised Callan not to use them anymore.

¶ 74    When shown the Letter, James identified it as the letter Public Awareness was instructed to provide advertisers and Safety Publications was instructed to provide individuals who pledged to make a donation. Donors received the Letter after pledging during a telephone solicitation, while advertisers received it when their advertisement and payment were collected. An individual may not donate just because he or she pledged. Advertising money was paid to Public Awareness and then to Callan, while donations were sent to Callan directly and Callan would not know money was coming until Callan received it. James identified lists of businesses that advertised in the newspaper for FOP and lists of individual donors to FOP, including names and the amounts and dates of payments. The Letter was signed by Nolan or Donahue as FOP president and were intended to provide basic background on FOP programs to potential donors. It was prepared collaboratively with Callan providing the initial drafts and then discussing them with FOP, probably Nolan or Barski. Neither Public Awareness nor Safety Publications could change the Letter once it was signed for FOP, and Callan would not change it once signed.

¶ 75    Public Awareness and Safety Publications were provided presentations to adhere to, and they could discuss the Letter. FOP programs mentioned in the Letter include death benefits, scholarships, AD&D insurance, legislative representation, and legal representation. When asked if "Bill Nolan, Al Barski, John Capparelli, Mark Donahue advised you that the money being raised would be used for" the programs in the Letter, James replied "I would certainly understand it" and "Everybody understood that." It was "certainly possible" that advertisers and donors could believe after reading the Letter that donations would benefit officers killed in the line of duty. When asked if it was his "intention on behalf of the FOP that the public understood that donating, they were contributing to a measure of security for injured officers and families of officers killed in the line of duty," James replied, "I wouldn't phrase it that way."

¶ 76    James was familiar with the Charity Act. FOP never told Callan that FOP would be using the funds raised for golfing, fishing, political donations, and conventions "instead of" the purposes in the Letter. However, if FOP had said so, James would not have advised FOP to include that information in the Letter. FOP did not tell Callan to say through Public Awareness and Safety Publications that the money would be spent on golfing, fishing, political donations, or conventions nor that only 20% would go to FOP. While Callan sent weekly reports to FOP, FOP never asked to see the basis for those reports. Callan never looked at the records of Public Awareness or Safety Publications to confirm their expenses, seeing no reason to do so because Callan "either received the donation or advertising payments or we didn't."

¶ 77    Callan received donations through a mail service, processed and accounted for the donations, deposited the money due FOP into the account for FOP, and prepared its weekly report to FOP. When Public Awareness received advertising payments, it would then gather them and forward them to Callan along with the advertisements. Callan would then pay commissions, program expenses, and general administrative costs. Weekly reports would not reflect what the contractors were paid but instead the total revenue from each of the two campaigns and FOP's percentage. Money from the two campaigns, to pay Callan's expenses and the contractors, was at first deposited into a single bank account, but by 2002 or 2003, each campaign had its own account. Callan paid Public Awareness a commission for its work and also a referral fee on Safety Publications' work, as Public Awareness referred Callan to Safety

Publications. FOP was probably not informed of this referral fee, and James saw no reason it should have been.

¶ 78    Based on Callan's accounts and reports to FOP, Public Awareness raised $2,487,841.80 and Safety Publications raised $1,934,808.91 between March 27, 1998, and the last day of 2003.

¶ 79    Callan filed reports with the Attorney General, and James signed without question reports prepared by Bill. James and Bill also signed reports that FOP filed with the Attorney General. The reports filed by FOP did not itemize expenses, and James did not recall FOP asking for itemization. Callan did not work with Public Awareness or Safety Publications in Illinois after 2003.

¶ 80    On cross-examination by Callan, James testified that his father founded Callan in the 1960s, and James retired from Callan in 2014, so that he was president during the period of 1998 to 2003. James also owned a portion of Callan until he sold it in 2014. Callan offered its periodical publication service to public safety organizations, whereby advertising would be sold in a publication and the sponsoring organization would receive a percentage of that revenue as well as a periodical to reach out to its membership. Organizations would receive about 25% when Callan began, but "economics of the publications began to change," and the sponsoring organization's percentage fell to 15% or less.

¶ 81    Callan worked with defendant FOP since the mid-1990s, having worked with other lodges of the organization. Callan "typically" did not do individual fundraising but periodical advertising sales. FOP's percentage was "comparable" to the percentage paid to other sponsoring organizations, taking into account that most organizations needed only about 2000 to 3000 copies of each edition while FOP needed about 17,000. James knew Nolan from other FOP organizations and approached him to start a program. The July 2000 contracts between Callan and FOP at issue were signed by James for Callan and Nolan and Barski for FOP and provided that Callan was not FOP's agent or employee but an independent contractor. The earlier FOP-Callan contracts were substantially similar. Because of the percentage nature of the contracts, the money paid to FOP was independent of Callan's expenses or those of its contractors, except that FOP paid Callan for postage for the periodical. The FOP-Callan contracts were filed with the Attorney General.

¶ 82    Callan contracted with Safety Publications for the individual fundraising campaign and Public Awareness for the advertising campaign. Callan had worked with Public Awareness previously. The annual Callan-Public Awareness contract for 2000 was signed by Valentine for Public Awareness and a Callan employee for Callan. It provided that Public Awareness was not subject to Callan's control and would not act on Callan's account but its own, Callan did not consent for Public Awareness to be subject to Callan's control, Public Awareness could not bind or make representations for Callan, and Public Awareness could not create a fiduciary relationship between Callan and third parties. Also, Callan was not responsible for Public Awareness's expenses as it was independent of Callan and not its employee, and Public Awareness would provide and maintain its own equipment and pay its own employee costs. The annual Callan-Safety Publications contract for 2000 was signed by Herdman for Safety Publications and a Callan employee for Callan, and its provisions on the relationship between Callan and Safety Publications was substantially identical to the aforesaid contract with Public Awareness. Also substantially identical were the other contracts between Callan and Public

Awareness for 2001 through 2003 and Callan and Safety Publications for 1998 through 2003. James did not believe that the contracts were filed with the Attorney General.

¶ 83     The contracts were accompanied by guidelines from Callan for each contractor that were binding on the contractor, including that solicitors should answer all questions from potential advertisers or donors truthfully and fully. Callan did not train its contractors' solicitors. Callan provided scripts for solicitors, and while the scripts had been amended, they were substantively identical. James helped produce the scripts, which the solicitors were expected to follow. James visited two Safety Publications call centers at some point between 1998 and 2003 and visited Public Awareness call centers annually during that period, and he did not hear solicitors deviate from the scripts. Callan never authorized solicitors to say they were calling on behalf of disabled police officers or the families of deceased officers, nor did James discuss that with the contractors or overhear such a discussion. FOP had not authorized Callan to call on behalf of disabled officers or the families of deceased officers.

¶ 84     James prepared the Letter based on his experience working with other public safety organizations and then brought it to Nolan to see if FOP liked the Letter and approved of it. Multiple copies of the signed Letter were then provided to the contractors, who were expected to use them. The reference in the Letter to the harsh realities of law enforcement was not meant to refer only to disability and death, as Callan was calling for all FOP members and not just some portion of the membership.

¶ 85     Two lawsuits by the Attorney General against Callan, Safety Publications, and Public Awareness had been settled by consent decree. The allegations against Callan had concerned Callan not registering under the Charity Act and did not concern improperly raising funds for disabled or deceased officers. The accounting included in the consent decrees, which accurately reflected all funds raised for the FOP campaigns for 1998 through 2003, showed that Callan's costs for the FOP campaigns were not covered and Callan did not make a profit on the campaigns. Under the consent decrees, Callan had to pay the Attorney General $40,000 in fines. As Callan's treasurer, Bill addressed all financial matters for Callan from 1998 through 2003. He was a certified public accountant (CPA) and was "meticulous" in both internal accounting and reporting to Callan's clients, and James trusted and relied on him. All payments for a particular campaign would be grouped together and counted separately by two employees before being deposited in the client's account. The employees processing checks would read each memo line to ensure that the check was not for a specified or restricted purpose, and checks so restricted would be returned. For instance, if payment for an advertisement were marked as a charitable contribution, either the check would be returned or the advertiser would be contacted to confirm his or her intent. Such things happened occasionally, including on the FOP campaigns. James did not recall any checks restricted to disabled officers or families of deceased officers.

¶ 86     On cross-examination by FOP, James testified that he would listen to FOP comments about solicitors because it was good business to keep FOP satisfied.

¶ 87     On redirect examination, James testified that any contracts not provided to plaintiffs in discovery were omitted inadvertently and he thought they had been produced. He recalled the 2002 television news segment on telemarketing including Public Awareness but not the content of the segment except that he did not believe the allegations therein to be true. He did not recall discussing with Chenault of Public Awareness any telemarketing for disabled officers. He did not recall listening in on solicitation calls in addition to visiting the contractors' call centers,

and the calls were not recorded in the 1998-2003 period. The Callan-FOP contracts authorized Callan to endorse checks for FOP because donation checks were made payable to FOP. While FOP was not a charitable organization, the FOP-Callan contracts cited the Charity Act. FOP was not a party to any of Callan's contracts with its contractors. When Callan entered into the consent decrees in November 2003, the instant cases were pending, but James did not discuss the allegations in this case with the Attorney General's office. Callan paid no money under the consent decrees.

¶ 88      On recross examination, James testified that the Callan-FOP contracts referred to the Charity Act for Callan and FOP to waive any rights thereunder. Callan paid the $40,000 in fines under the consent decrees.

¶ 89      The court admitted portions of Bill's deposition describing the process by which individual donations were solicited and reached Callan. "The subcontractor will call potential sponsors at their homes to qualify them as a potential sponsor. They would then either mail themselves or arrange through a mail service company to forward confirmations to the potential sponsors." If a potential donor chose to donate, "they would forward generally a check in the mail—to a mail service office that would then package the mail without opening it and forward it to" Callan's office where the "money is then processed by the accounting department, deposited." In other words, "the mail coming in is pre-batched, of course, presorted as to just [FOP]. *** The deposit is balanced to the batch processing and the money is deposited in a depository account from the bank." After depositing,

> "it gets transferred to an operating account so that the association can be paid their portion. The commission has to be paid to the subcontractor who generated a sponsorship and then the moneys remain in the operating account to pay direct expenses of the project as well as general administrative expenses as a whole—of the company as a whole."

¶ 90                               3. Public Awareness

¶ 91      The court admitted into evidence Chenault's affidavit as the admission of a party-opponent relevant to prove up the complaint against a defaulting party. Chenault averred that, between 1998 and 2004, he and Valentine were directors of Public Awareness, FOP contracted with Callan "to solicit donations and advertising space," Callan contracted with Public Awareness "to perform advertising solicitations," and Public Awareness solicited advertising using a presentation sheet or script and the Letter. Public Awareness's solicitors used the script as a guide "but did not strictly adhere to" it. Callan and FOP provided the Letter to Public Awareness and told Chenault that FOP would use the funds raised for the purposes in the Letter, and Chenault had no input in the Letter's creation. The Letter was given to all or most potential advertisers.

¶ 92      Chenault and Public Awareness's solicitors told potential donors that FOP would place the funds in a general fund "to be used, in part, to benefit Chicago duty disabled police officer and families of Chicago police officers killed in the line of duty through the purchase of accidental death and disability insurance, legal assistance and scholarship funds." Chenault made such a presentation and overheard solicitors making such a presentation hundreds of times weekly. He never said or overheard a presentation that FOP would spend the money on political donations, golf, or fishing tournaments.

¶ 93    To Chenault's knowledge, Barski never called Public Awareness to tell it to fire solicitors nor to stop telling potential donors that part of the money would be spent on disabled officers through AD&D insurance. Public Awareness received the raised money and sent it on to Callan, which then disbursed money to Public Awareness to pay its fee and expenses. Public Awareness had no control over use of the raised funds by Callan or FOP once it sent them to Callan.

¶ 94    The court admitted into evidence a request to admit directed against Public Awareness, Chenault, Valentine, Dugo, Brown, and Gentile. Chenault and Valentine were directors of Public Awareness, which hired Dugo and Gentile to conduct fundraising. Between 1998 and 2004, Public Awareness, Chenault, Valentine, Dugo, Brown, and Gentile were the agents of each other, FOP, and Callan, and they solicited and collected funds from the public on behalf of plaintiffs. FOP contracted with Callan, gave it proprietary use of its name, and authorized it to subcontract fundraising. Callan had actual or implicit authority as FOP's agent in how Callan or its agents conducted fundraising. FOP through Callan hired Public Awareness and Safety Publications to solicit funds for plaintiffs, and Public Awareness was acting within the scope of its agency with Callan and FOP when it performed fundraising.

¶ 95    The request to admit continued that Callan itself and through its agents including Public Awareness "solicited and raised donations from the public for disabled Chicago Police officers and families of Chicago Police officers killed in the line of duty." They informed the public that its donations were for their benefit, and they did not mention that only 22% of donations would go to their benefit. The public relied on these representations in making donations and expected that their donations would benefit plaintiffs. As to Public Awareness, in 1998, it raised $246,396.75 and FOP received $46,898.60; in 1999, it raised $276,123 and FOP received $53,169.09; in 2000, it raised $438,451.50 and FOP received $85,407.26; in 2001, it raised $601,627.21 and FOP received $118,325.44; in 2002, it raised $625,665.81 and FOP received $123,133.15; in 2003, it raised $417,349.27 and FOP received $81,776.55; and in 2004, it raised $465 and FOP received $83.70. As to Safety Publications, in 1998, it raised $360,393.40 and FOP received $79,286.54; in 1999, it raised $347,111.66 and FOP received $82,304.56; in 2000, it raised $432,025.96 and FOP received $95,045,70; in 2001, it raised $381,981.18 and FOP received $84,035.82; in 2002, it raised $325,338 and FOP received $71,574.36; in 2003, it raised $157,175.71 and FOP received $34,578.64; and in 2004, it raised $2300 and FOP received $530.10. Defendants raised additional funds for which there was no accounting. Plaintiffs were the beneficiaries of the donations but received none of the donations, and each defendant is a fiduciary of plaintiffs for the funds it raised. FOP became aware that Public Awareness was telling the public that donations would benefit plaintiffs, but FOP did not tell Public Awareness to stop making such representations.

¶ 96                              4. Safety Publications

¶ 97    The court admitted portions of Herdman's deposition. Callan provided Safety Publications scripts for telephone solicitations and brochures and letters to send to potential donors so that it told Safety Publications what to say to the public. If Callan found out that Safety Publications was not conducting business in a satisfactory manner," or was "representing them falsely to the public," Callan could tell Safety Publications "we want you to change this aspect of your business or not to use this person." FOP never requested an accounting of Safety Publications' financial records.

¶ 98 At FOP's behest, the court admitted other portions of Herdman's deposition. Safety Publications had a contract with Callan, and Callan prohibited it from representing that its solicitors were members of FOP. Callan did not tell Safety Publications who it could employ as solicitors, did not pay its taxes or rent for the FOP campaign, and did not pay it for the Attorney General's judgment against it. There was no agreement between Callan and Safety Publications for either to pay the other's legal fees or any judgment. Callan did not train Safety Publications' solicitors. Herdman never had contact with anyone from FOP any time between 1998 and 2004. Callan never told Herdman during that same period that FOP did not want certain solicitors working on its campaign. FOP never inspected Safety Publications' facilities. Herdman did not know Capparelli and could not recall ever speaking with Barski. He never discussed with Callan having police officers act as undercover agents at one of Safety Publications' call centers.

¶ 99 The court admitted portions of Olivera's deposition. Callan told Safety Publications what to say to potential donors by providing a script and guidelines and also provided brochures and letters that Safety Publications sent to potential donors. Safety Publications did not create those documents.

¶ 100 At FOP's behest the court admitted other portions of Olivera's deposition. Safety Publications had contracts with Callan from 1998 through 2003 determining the services it would provide and the compensation it would receive. Olivera had no personal knowledge of the relationship between Callan and FOP, never saw their contract, and never had direct contact with anyone from FOP in that period. Callan never told Olivera that FOP was telling it to change the script or the Letter. Neither FOP nor Callan ever inspected Safety Publications' facilities or its accounts, and Callan did not inspect how Safety Publications was running the FOP campaign. Olivera believed that FOP could not tell Safety Publications to change anything if it was unsatisfied with something Safety Publications did. The guidelines from Callan did not govern how Safety Publications ran its business but merely what Callan expected its solicitors to say and represent. To Olivera's knowledge, undercover police did not come to Safety Publications' call center. Callan did not pay Safety Publications' fines in the Attorney General litigation.

¶ 101                                         5. Donors

¶ 102 Maureen Owens testified that she made two $10 donations, in 2001 and 2003, each after receiving a telephone call. The caller asked "if I would be willing to donate to a fund for fallen policemen and for disabled policemen, for the families of the fallen policemen, and I said, Certainly." She was told she would receive a decal for her car window if she donated, and she placed the decal in her car window as "a good way of promoting the charity." She intended her donations to benefit the "families of fallen officers and disabled officers of the City of Chicago." In neither call did the caller mention "that 78 to 80 percent of the money would be going to the telemarketers who were making the call" or that the remainder "would be used for fishing, golfing, political donations, [or] conventions." If they had, she would not have donated.

¶ 103 On cross-examination by Callan, Owens testified that she received only two calls from, and made only two donations to, FOP. She asked no questions in either call nor could she recall what organization the callers said they were with. When shown the Letter, she could not recall receiving it but acknowledged that she may have. Had she received it, she may still have

donated but would have asked for more information about the percentage of administrative costs. When asked if the Letter indicated "that the money is going solely for the benefit of disabled and families of fallen police officers," she replied that it did, based on a paragraph stating (as she characterized) "Chicago police officers and their families live each day with the harsh realities of crime prevention and criminal apprehension. They attempt to alleviate these concerns for Chicago officers through a legal defense program, AD&D insurance—which I thought to be, like, disability insurance—line of duty death benefit, legal services of legislative representation." She admitted that there are harsh realities of crime prevention other than disability and death but reiterated that "during the phone call, I was told that it would benefit the families of fallen officers and disabled officers, so that's who I thought it would benefit." When shown portions of the Letter stating that FOP is not a charitable organization, "[s]ponsor member revenues cover the costs of marketing, administration, and program messages while generating income," and a "substantial share of sponsor revenue covers the costs of this campaign with net proceeds available to [FOP] for its general fund," she replied that she probably would have asked questions before donating if she had read that. While "nothing in that letter *** says that these funds are expressly being used to help the disabled police officers," she "would've received this letter after I had donated."

¶ 104    Owens learned of the administrative costs and usage of the funds in 2005 when she received a draft affidavit from plaintiffs' counsel by mail. She signed and returned it without phoning to ask any questions. After reading the affidavit, she felt deceived and that her donations went to "frivolous causes as opposed to benefitting the recipients." Afterwards, "I no longer would volunteer to donate over the phone, and I've learned to ask charities what percentage of the donation would actually go to the recipients." She has made charitable donations since but only by mail and asking for more information after receiving a solicitation.

¶ 105    On cross-examination by FOP, Owens testified that the 2003 caller

> "said he was calling on behalf of this organization and wanted to know if I would be willing to donate because the donation would go for—to benefit the police officers who were—had been killed in the line of duty or had been disabled and that it would also be—the officers that were killed in the line of duty would—their families would benefit from these—this donation."

He may have named the organization, but she could not recall. She told the caller that she would be happy to donate, and she had made the decision to donate before hanging up. She was unaware that "there are different FOP organizations" and admitted that it was possible another organization other than defendant FOP called. Owens's affidavit referred only to one of the two calls, but she did not call to ask why it did not refer to both calls because "maybe I wasn't aware that the second phone call was going to be in question, that they were only questioning the first phone call."

¶ 106    On redirect examination, Owens testified that she would not have signed the affidavit if it was not true and accurate. She did not recall receiving a call from plaintiffs' counsel, asking about her donations, before she signed the affidavit.

¶ 107    Harry Barker testified that he made two $10 donations, in 2000 and 2002, "for a good charitable reason, for retired cops or to—injured policemen or their families for dead cops." Each time, he donated after receiving a call asking "if I would donate to injured policemen, a fund for injured policemen or for the families of dead policemen killed in action." Neither caller said that 80% of the money would be kept by the Telemarketers, nor "that the FOP was

going to use it for political donations, golf outings, *** fishing tournaments, or conventions." If they had, he would not have donated.

¶ 108    On cross-examination by Callan, Barker testified that, as best as he could recall, he received only two calls from FOP and asked no questions during either call. While he could not independently recall when the calls happened, the call records from defendants coincided with his records of charitable donations. He recalled being told that the donations would be tax-deductible. He received no acknowledgement of his donations, and he did not remember receiving the Letter. Plaintiffs' counsel later called Barker, asked him about his donations, and then sent him a draft affidavit. Afterwards, Barker felt like he had been tricked. On redirect examination, Barker testified that his affidavit was true and accurate.

¶ 109    Barbara Newcomb testified that she made donations of $25 in 2001 and $10 in 2003 but had no recollection at trial of those calls. However, she signed an affidavit in 2006. She was unsure whether she would have read it before signing but probably would have corrected any errors, and she acknowledged that her recollection of the calls would have been better then. She did not recall discussing the affidavit with plaintiffs' counsel before signing. Admission of the affidavit into evidence was objected to, and the court sustained the objection and excluded Newcomb's affidavit.

¶ 110    David Sensibar testified that he made donations of $40 in April 2001, $50 in December 2001, and $50 in 2003 but had no recollection at trial of those calls. However, his 2005 affidavit refreshed his recollection that he received calls asking him to "make a donation to support the police." He would not have donated had he been told the telemarketer would retain most of the money, but he could not recall exactly what the callers said. He "assumed that the money was going to support police who were injured and their families." When asked why he assumed so, he explained that "I contribute to a variety of police organizations every year, and *** all of them tell me that this is to support the families of police" and that he had no reason to doubt his own affidavit. None of the three callers told him that 80% of the money would go to the Telemarketers or that "FOP would be using the money for golfing, fishing, political donations, [or] conventions," and he would not have donated if they had.

¶ 111    On cross-examination by Callan, Sensibar testified that plaintiffs' counsel mailed him the draft affidavit after discussing his donations with him. He was upset when he learned that his donations were not spent for the purposes he thought they were. He made other charitable donations and had given to another FOP lodge than defendant FOP but could not recall what they told him when they called. He reiterated that "[i]n general *** police organizations tell me" that his donations are for disabled officers and officers killed on duty. He would not have contributed if he was told that his donation would be spent on officers' legal defense. He could not recall receiving the Letter. After reading it at trial, he probably still would have donated. When asked if the Letter was consistent with his understanding of what FOP does, he replied "I don't know what the FOP does." He did not know in 2001 what the Letter told him of FOP's purposes, and he would have no objection to his donations being spent for those purposes.

¶ 112    On cross-examination by FOP, Sensibar testified that his recollection was refreshed about the calls and the particulars of his donations, but he remembered making the donations and that the first caller said he was calling for FOP. Plaintiffs' counsel described the case generally when he discussed Sensibar's donations, but Sensibar could not recall particular questions he asked beyond asking about Sensibar's three donations and whether telemarketers told him the money would be used for disabled officers and families of deceased officers. Plaintiffs' counsel

asked Sensibar if he was willing to sign an affidavit, and when he replied positively sent him a completed draft affidavit so that he merely had to sign and date it. Sensibar "had donated to several FOPs" as of 2005 when he signed the affidavit.

¶ 113 On redirect examination, Sensibar testified that "based upon the phone call that the money would go to benefit disabled officers and families of officers killed in the line of duty," he believed that was a function FOP was providing to officers and intended his donations to be spent on that. He would not have donated had he known his donations would be spent on golfing, fishing, and political donations. While the affidavit was prepared by plaintiffs' counsel, he did so after discussing the case with Sensibar, and the content of the affidavit reflected their conversation. He read the affidavit to ensure that it was accurate before signing and indeed made a correction to it before signing.

¶ 114 Ellen Gualtieri testified that she made a $10 donation in 2001 but had no recollection at trial of that call. However, she signed an affidavit in 2005 when she had better recollection. When asked after reading her affidavit if she could now recall what the caller said to prompt her to donate, she could not. "I think there were probably quite a few of those calls that I had received over the years for police donations. I can't specifically remember that particular" call. Based on her affidavit, "they called to ask me for a donation for the police to help them, for the families of policemen who were killed or incapacitated, disabled, and so they asked me for a donation." She donated "expect[ing] that it would benefit the families of injured or killed police officers." She would not have donated if the caller said 80% of her money would be kept by the Telemarketer or FOP would spend the rest on "political donations, golf outings, and fishing tournaments."

¶ 115 On cross-examination by Callan, Gualtieri testified that she signed another statement in 2007 that she was "unsure of the accuracy of the content of the 2005 affidavit that was written for me." When asked if she was being truthful in her 2007 statement, she replied that she believed so but could not be certain. Also, she believed she was being truthful when she signed the 2005 affidavit. She reiterated that she could not recall at trial what the caller said in 2001. She did not recall receiving the Letter and could not say whether it was consistent with what the caller said. Having read it, she was unsure whether she would still have donated.

¶ 116 On cross-examination by FOP, Gualtieri testified that while she had no recollection of when she received the solicitation call, she denied that her affidavit could be mistaken as to the date of the telephone call because she made the donation the same day, as she could have paid by credit card or merely committed that day to making her donation.

¶ 117 On redirect examination, Gualtieri testified to being surprised by the 2007 statement that she was unsure of her 2005 affidavit, as she could not recall as of trial why she signed it or of what she was unsure.

¶ 118 The court admitted into evidence the 2018 deposition of Susan Wein Bernhardt. She made a $25 donation in 2002 but had no recollection at trial of that call. She signed a statement in 2005 when she had better recollection. Plaintiffs' counsel had her recite the statement: she received a call in February 2002 from a caller stating that he was calling from FOP, asking for a donation for disabled officers and the families of deceased officers, and she donated relying on that representation and expecting it would benefit disabled officers and the families of deceased officers. She was not told the money would be put into a general fund for any purpose nor that only 22% would go to FOP. The trial court ruled that the statement would not come into evidence.

¶ 119    On cross-examination by Callan, Bernhardt testified that she did not recall signing the statement and had no independent recollection of its content. Over the years, she received many calls from FOP seeking donations and she made multiple donations, and she could not recall when she last received such a call. She did not recall asking solicitors any questions nor receiving a letter explaining what FOP does. She could not say whether her signed statement applied to other solicitation calls she received. She believed from solicitation calls generally that FOP existed to benefit injured officers and their families, and she intended her donations to FOP to be spent on them. She did not know if FOP did anything else.

¶ 120    Bernhardt did not recall ever seeing the Letter before trial. It referred to security for families through a legal defense fund and death benefits. However, it did not state that her donation would go exclusively to disabled or deceased officers, and it referred to FOP engaging in more activities that she had assumed it did. Because it referred to some of the donated money being spent on fundraising expenses, she probably would not have made a donation had she seen the Letter first.

¶ 121    On cross-examination by FOP, Bernhardt testified that she had no documentation of her 2002 donation such as a cancelled check or bank statement, as she is not in the habit of keeping checks more than five years. She also had no recollection of how she came to sign her statement. She understood that FOP is part of a larger organization with multiple lodges or chapters.

¶ 122                                              6. Plaintiffs

¶ 123    Michael Byrne testified that he was a police officer on active duty from 1966 until he was shot in the chest in 1983, which left him unable to work in the field. He received disability benefits including health insurance from the police pension board in 1989. For a three to six month period during that interim, he received no income from the police department or pension board and had to spend money he had saved for his children's education, though his award of benefits was retroactive once granted. In the 1998 to 2003 period, he had heart issues that required treatment, including implantation of a pacemaker, for which he had to pay a 20% copay. FOP never told Byrne that it had disability benefits in addition to his official benefits nor that it had a fund for disabled officers for benefits including scholarships. Byrne joined an organization of disabled police officers, where he learned of other disabled officers who had financial difficulty due to the interim preceding receiving official disability benefits. FOP never told Byrne between 1998 and November 2002 that it created a fund to provide financial assistance to disabled officers and the families of deceased officers.

¶ 124    Byrne became aware of an October or November 2002 television news investigation by Dave Savini of telemarketers for FOP raising money for disabled officers. Savini called and then met with him, and he told Savini that he received no money from FOP for his disability. Before meeting Savini, he was unaware of any allegations that FOP telemarketers were telling potential donors that their donations would benefit disabled officers. Byrne watched Savini's news segment in November 2002 and saw himself and other disabled officers including plaintiff Jackson being interviewed. He then brought the instant suits beginning in March 2003 "because I believe that all disabled police officers or widows should have been given money that was raised in their behalf rather than have the money go for parties, political donations, and things like that." Had he known FOP was raising funds for disabled officers, he would have gone to FOP for assistance and advised other disabled officers to do so. As Byrne had not

been aware of the Attorney General lawsuits against Telemarketers at the time, the Attorney General's office never told him that (1) it was representing disabled officers or the families of deceased officers or (2) Telemarketers were paying fines in the settled lawsuits that he or other disabled officers could use.

¶ 125    On cross-examination by Callan, Byrne testified that he was unaware that his counsel had tried to intervene in the Attorney General lawsuits. He admitted that money spent by FOP on political activity to benefit police would benefit all its members. He believed FOP provides legal assistance to its members. He did not ask FOP for a loan during the interim that he was not being paid. While he did not attend FOP fishing or golfing events, he did attend an FOP picnic at an amusement park, and he admitted that the purposes of FOP include promoting camaraderie as well as providing collective bargaining and legal representation, including representation at disability and pension hearings. He had no objection to FOP paying for fraternal activities but was upset that it did not offer him financial assistance during his unpaid interim. His son told him of receiving a telephone solicitation for FOP for disabled officers, but he could not recall if it was before or after Savini's segment aired. He had never heard of Callan nor seen the contracts between FOP and Callan before commencing these cases.

¶ 126    On cross-examination by FOP, Byrne testified that he was still an FOP member though no longer a police officer. He did not recall if he had to pay FOP dues while on disability but it was "possible." FOP told him to call its counsel to represent him in his disability claim, and he knew that FOP would pay its counsel, but he chose to employ his own counsel at his expense. While he was a disabled officer, he was not the family member of a deceased officer. While he had not seen the FOP-Callan contracts, he believed they established that FOP hired Callan to raise funds for disabled officers and families of deceased officers. He was never solicited by FOP or Telemarketers nor did he donate to the FOP campaigns. His son who was solicited did not donate, and Byrne did not know if that solicitor was actually representing FOP or was an impostor.

¶ 127    Talmitch Jackson testified that he was a police officer on active duty from 1988 until he was shot in 1994, which required multiple surgeries and left him unable to work. He received 50% disability benefits from the police pension board in 1996 and had to proceed before the board again to receive 75% benefits. For a three to four month period in the interim before the first award, he received no income from the police department or pension board and had to spend his retirement savings. He was receiving medical treatment in the 1998 to 2003 period and still receiving treatment at the time of trial.

¶ 128    Jackson joined an organization of disabled police officers, where he learned of other disabled officers who had financial difficulty. FOP never told Jackson between 1998 and 2003, nor did Jackson hear before the Savini segment in November 2002, that FOP raised money for disabled officers and the families of deceased officers. He joined the instant cases as a plaintiff because he believed FOP was not representing the interests of disabled officers. After these cases commenced, Jackson went to FOP to seek assistance with his claim to be paid for over 300 hours of vacation and personal time from when he was an officer, but FOP officials including Donahue told him that they would not provide assistance because he was suing FOP. The Attorney General's office never contacted Jackson about its lawsuits and thus never told him that the fines paid in settlement of those cases would be available to assist disabled or deceased officers. He received no money from the Attorney General's settlements.

¶ 129    On cross-examination by Callan, Jackson testified that he was disappointed that FOP did

not assist him financially and "has become so corrupt." He was still an FOP member as of trial. While he did not attend FOP fishing or golf tournaments, he attended FOP picnics. When asked if FOP provides legal services to its members, Jackson replied that FOP has a duty to represent all its members but chooses in which cases or claims they will represent members, and FOP-paid counsel "misrepresented" him in his disability hearings. He became aware of the Attorney General lawsuits "around the time" of the Savini investigation.

¶ 130 On cross-examination by FOP, Jackson testified that he was still a police officer on duty disability rather than permanent disability but had applied for permanent disability. He could not recall if he was represented by FOP or the government in his permanent disability claim, but he did not pay for his representation. As a disabled officer, he was no longer paying FOP dues. While he was a disabled officer, he was not a family member of a deceased officer. He watched the Savini segment, which he believed mentioned FOP fundraising for disabled and deceased officers. He was never solicited by FOP or Telemarketers by telephone, and he received a mail solicitation by FOP for donations but it did not mention disabled or deceased officers.

¶ 131                                    7. Plaintiffs' Expert

¶ 132 The court admitted into evidence the evidence deposition of plaintiffs' expert Robert Cohen as a CPA and certified fraud examiner who had worked in nonprofit accounting for decades. Before forming any opinions, he reviewed the depositions of defendants, any affidavits, financial records, and FOP's federal tax filings. If a nonprofit was raising money for restricted purposes, one would examine whether there was fraud or misappropriation by reading the documents surrounding solicitation of the money, including the purpose they were solicited for, and then determining whether it was spent on the purposes for which it was raised. In other words, the records behind a financial statement should be examined in evaluating the statement. The nonprofit or its auditor should be sending confirmation letters to donors to confirm that the financial statements are correct. While Cohen had never audited FOP or another branch of that organization, the standards for nonprofit accounting apply to all nonprofits.

¶ 133 Donations to a nonprofit may be unrestricted, temporarily restricted, or permanently restricted. Unrestricted donations can be spent on any purpose of the organization, while temporarily restricted donations were made for a limited purpose and must be spent only on that purpose. If a donation was not accompanied by a statement of the donor limiting its purpose, one would also examine the solicitations sent to prospective donors to determine whether donations were solicited for general or specific purposes. In other words, a restriction may be expressed by a donor or by the donee's representations. Thus, a donation would be deemed restricted where a nonprofit represented that it would be spent for limited purposes and the donor made no express restriction or statement of intent. Oral representations would not affect whether a donation was deemed restricted unless the representation was somehow documented. Under the applicable accounting standards, absent an express restriction by the donor "or circumstances surrounding the receipt of the contribution that may clear the donor's implicit restriction on use," contributions are deemed unrestricted. The standards also require nonprofits to distinguish unrestricted, temporarily restricted, or permanently restricted contributions, and a "restriction on an organization's use of the assets contributed results either from a donor-explicit stipulation or from circumstances surrounding the receipt of the

contribution that may clear the donor's implicit restriction on use." A promise to give is accounted for once the promise is made and received. Money donated for a specific purpose is restricted and must be segregated as restricted.

¶ 134    Here, Public Awareness was soliciting from businesses for an advertising campaign while Safety Publications was soliciting from the general public for individual contributions. When shown the Letter, Cohen described it from the surrounding documentation as being prepared by Callan and sent to Barski at FOP for signature. Cohen believed that FOP had approval of the Letter and could change it. Cohen opined that the funds raised by Public Awareness from March 1998 to the end of 2003 were restricted to the purposes stated in the Letter. As such, FOP was obligated to report and document correctly both the donations and how they were spent and to not spend them on general purposes. It would be a misappropriation if FOP or Public Awareness spent any of the money otherwise than on plaintiffs and the Class. He based this opinion on donor affidavits; depositions of James, Capparelli, and Chenault; the Letter referring to the harsh realities of law enforcement; and "other documentation." Cohen similarly opined regarding Safety Publications and the funds it raised, including that all of the funds raised should have been restricted to being spent on plaintiffs and the Class. His opinion being partially based on donor affidavits, it was not affected when some affiants later submitted statements that they were unsure of their affidavits because none of the latter statements said that the affidavits were incorrect.

¶ 135    Looking at the scripts provided to Public Awareness and Safety Publications, Cohen opined that he would not rely on them regarding whether donations were restricted because they were guidelines for the solicitors rather than verbatim instructions; that is, there was evidence in the depositions and affidavits that solicitors strayed from the scripts. Assuming *arguendo* that the solicitors adhered to the scripts but the Letter was then sent to a donor, the resulting donation would be restricted. Cohen opined that FOP did not spend the funds raised by its campaigns on the Class because there was deposition testimony that FOP spent the money on general expenses and FOP's accounts so reflected.

¶ 136    An accountant for a nonprofit in Illinois should be familiar with applicable law, including the Charity Act, because charitable donations affect the nonprofit's financial statements, federal filings, and filings with the Attorney General. It provides in relevant part that a solicitor for a charitable organization makes a misrepresentation when he or she

> "is relating the projected use of solicited charitable funds and knowingly falsely states in a material fashion the charitable purposes for which the charitable funds collected are to be used or are being used or fails to disclose the primary program service to which such funds are known to be devoted." 225 ILCS 460/18(b) (West 2002).

FOP's federal filings stated that it received from the campaigns $122,000 one year and $136,659 another year to defray costs including golf outings and political contributions that could not be paid from membership dues. FOP's filings with the Attorney General indicated that the funds from the campaigns were unrestricted fundraising revenues. Cohen opined that FOP's financial statements contained material misrepresentations and that an auditor should have disclosed that to FOP.

¶ 137    Charitable organizations are also required by the Charity Act to "supervise fund raising activities to ensure that contributions are adequately protected and devoted to the proper purpose and that statements or representations made during solicitations to the public are true and correct." *Id.* § 15(a). Nonprofit accounting standards similarly require that a nonprofit

- 29 -

"ensure that it uses donated assets as stipulated" and provide that information on restricted donations is relevant to financial statements. Thus, an accountant must ensure that restricted donations are properly segregated, and an auditor must test all documentation of restrictions as part of auditing financial statements. Donations raised by Public Awareness or Safety Publications should have been recorded as restricted when pledges were made and money received by Public Awareness or Safety Publications, respectively. FOP had a duty to the Class to oversee the funds raised by Public Awareness and Safety Publications, which shared the responsibility of accounting for restricted donations and ensuring that FOP received all funds raised except for documented and legitimate expenses of fundraising. However, FOP commingled restricted and unrestricted funds and did not itemize fundraising expenses. There was also nothing to indicate that Callan ever reviewed the expenses of Public Awareness or Safety Publications nor the money they raised. Cohen opined than an audit of fundraising expenses should be conducted.

¶ 138     On cross-examination by Callan, Cohen testified that he reviewed FOP's audited financial statements and the auditors reached different conclusions than Cohen. Because he was reviewing the documents provided him rather than conducting his own audit, Cohen requested no additional documents and did not see the documents the auditor reviewed to prepare the audit but opined that the auditor did not conduct a proper audit. He would have examined the documents surrounding solicitation of donations, including scripts and the Letter. He also would have selected some donors to send confirmation letters asking them to confirm if they made a donation for a certain purpose.

¶ 139     Cohen admitted that neither the scripts nor the Letter to prospective donors mention disabled officers or the families of deceased officers but noted that there was evidence the scripts were not followed. Cohen opined that if he read the Letter and disregarded other evidence, he would believe donations were being raised for the Class despite the absence of an express reference to the Class. He was unaware of any prospective donor who received the Letter and then called to restrict his or her donation to benefitting the Class, but he opined that most donors would rely on the solicitor's representations that preceded the Letter. The donor affidavits he reviewed were only a fraction of the total donors, and he did not know how many solicitors worked on the campaigns. While the Letter for potential advertisers referred to paying expenses from advertising revenue, Cohen opined based on FOP's financial statements that the revenue was not advertising but fundraising revenue. Cohen relied in part on Capparelli's deposition to conclude that the language in the Letter referring to alleviating the harsh realities of law enforcement meant that the funds were raised for the Class. While Capparelli testified that the harsh realities also included long work hours at nights and on holidays and weekends that keep an officer from his or her family, Cohen opined that long work hours exist for various professions and are not a harsh reality of law enforcement in particular. He did not know if donors would have seen or relied upon FOP's financial statements.

¶ 140     When asked if a restricted contribution has to be exclusive or can it benefit the Class and others, Cohen replied that the answer would depend on the representations made to potential donors, and a representation that the money would go to the Class would restrict the donation to benefitting the Class. Some of the Class members are also FOP members, and FOP provides benefits to its members. One of the donor affidavits referred to solicitors fundraising for disabled and deceased officers but not exclusively, solely, or only for them. When Callan was

sued by the Attorney General, it was for fundraising without registration rather than for misreporting expenses, but FOP did not declare to the Attorney General that it uses professional fundraisers.

¶ 141        On cross-examination by FOP, Cohen testified that verifiable documentation of a donation is the prerequisite to a donation having to be reflected in a financial statement. Verifiable documentation consists of written evidence or corroboration, such as a cancelled check or written pledge to donate. A donation would be unrestricted if the donor did not impose a restriction, unless the donee had a specific intent for the donation and expressed it to the donor. Stated another way, a donation is restricted if the donor expressly applies a restriction or the donee expressly represents to the donor that there is a restriction. A letter such as the Letter here, sent to a potential donor after the solicitation call but before a donation is made, could affect the analysis of whether a donation is restricted. Here, however, the Letter corroborated what the solicitors said about the use of donated funds rather than contradicting it, Cohen opined. While the donor and donee control whether a donation is restricted or unrestricted, an accountant determines if the nonprofit has properly characterized a donation in its financial statements. In auditing FOP's financial statements, FOP's accounting firm "did not comply with all aspects of professional standards."

¶ 142        Cohen reviewed the FOP bylaws but could not recall if they authorized general fundraising for specific purposes. A fraternal organization like FOP is a nonprofit subject to the same laws and accounting standards as other nonprofits. The federal regulations of nonprofits do not prohibit a fraternal organization from making political contributions or spending money on golf unless it would be a misappropriation of restricted funds.

¶ 143        On redirect, Cohen testified that the money from the advertising campaign was fundraising revenue rather than advertising revenue because FOP declared it as such in its financial statements. Cohen did not conduct an audit himself but believed one should be performed. Nothing in the depositions of Barski, Callan, Bill, Chenault, or Valentine corroborated Capparelli's testimony that the harsh realities of law enforcement include long and disruptive work hours. When one of the donor affidavits referred to a solicitor fundraising for disabled and deceased officers, that was sufficient to render that donation restricted. While pledge forms can document a donation, Cohen saw no pledge forms in this case. Nothing in Cohen's cross-examination changed his opinions.

¶ 144                                          8. Miscellaneous

¶ 145        During examination of the FOP official witnesses, the court reexamined its order *in limine* barring evidence of the television news investigation and segment by Savini. Plaintiffs argued that they were not seeking to use the evidence substantively but to impeach testimony that FOP officers did not know of telemarketers fundraising for disabled officers and to show that FOP had notice of allegations of such fundraising. Plaintiffs argued that the Savini investigation included fundraising for disabled officers, FOP was thereby aware of such allegations against Callan and Public Awareness, and FOP should be held liable for ratifying Telemarketers' actions by not taking countermeasures thereafter. The court denied reconsideration, finding that the impeachment was collateral and that substantive use to show notice was inadmissible hearsay and more prejudicial than probative. The court reserved its ruling on Savini testifying to what he personally observed.

¶ 146        However, plaintiffs' counsel argued during plaintiff Byrne's testimony that video of the

segment should be entered into evidence to impeach Donahue and Capparelli and to show notice to plaintiffs. The court noted that Byrne testified to learning of the allegations against FOP from Savini's investigation and segment and, while reiterating that impeachment would be collateral, admitted the video for the limited purpose of determining notice. The court stated that it would review the video to determine if it contained proper evidence. Savini was not called as a witness.

¶ 147 Plaintiffs told the court that they had served notices to appear for trial pursuant to Illinois Supreme Court Rule 237 (eff. July 1, 2005) upon Public Awareness, Chenault, Dugo, Brown, Gentile, Herdman, and Olivera, but they had not appeared, and plaintiffs therefore asked the court to find them in default. The court entered default judgment against them and against Safety Publications based on an earlier default finding. Triveri and Koronakos had never been served with process, and plaintiffs voluntarily dismissed them from the case.

¶ 148                                    9. FOP's Evidence

¶ 149 Martin Terpstra, CPA and certified fraud examiner, testified for FOP as an expert in accounting for nonprofits. He reviewed all of plaintiffs' materials including depositions, Cohen's opinions and underlying documents, financial statements audited by FOP's accounting firm, FOP's tax returns, and its bylaws.

¶ 150 Terpstra also reviewed the accounting standards for nonprofits. A nonprofit is an organization that receives tax-exempt status under federal law, including fraternal organizations of persons with similar interests and objectives organized into lodges that provide "combined interests, social activities, scholarship[ ] activities, [and] educational activities, *** have annual conventions and meetings, and *** provide services to meet the needs of their members." A fraternal organization must maintain the activities and services in its charter to maintain its tax exemption. FOP is a nonprofit, specifically a fraternal organization. Its mission is to provide collective bargaining services, legislative services, scholarships, social activities, investment advisory services, retirement counseling, and other services for its members.

¶ 151 The nonprofit accounting standards classify donations as unrestricted, temporarily restricted, or permanently restricted based on verifiable documentation that a promise regarding how the donation would be spent was made and received. Such documentation includes a formal agreement, a notation on the donation check, or a statement in a letter accompanying a donation. A temporary restriction is that the donation must be used for a particular purpose, while a permanent restriction is that the principal of the donation not be spent but the proceeds or income from the donation can be spent. A donation to a nonprofit with no express restrictions can be spent on any of the nonprofit's purposes. If a nonprofit solicits donations and mentions some of its purposes or functions, it need not disclose all its purposes and functions for a resulting donation to be unrestricted. An unrestricted donation to FOP could be spent on board salaries, political donations, golf tournaments, or attendance at national conferences. Terpstra reviewed the scripts and Letter used by the solicitors on the FOP campaigns, and they reflected FOP's general mission.

¶ 152 Terpstra opined that the donations to FOP at issue herein were unrestricted, based on an audit of FOP's statements by FOP's accounting firm, FOP's filings with the Attorney General, and FOP's federal tax filings. The audit was conducted according to generally accepted accounting principles. A CPA conducting an audit and determining if any donations were

restricted would look for documentation restricting a donation to a particular purpose, absent which the donation would be deemed unrestricted. While he did not know if the firm requested the scripts and Letter during its audit, a firm conducting an audit properly would be required to request such information. An auditor would want to confer with the treasurer of the organization being audited, but Terpstra could not recall any indication in the depositions of Capparelli or Barski that either discussed FOP's campaigns with the firm.

¶ 153    Terpstra opined that there was nothing improper about including the donations at issue with other FOP cash because nonprofits typically deposit cash in an operating account or possibly a payroll account and it would be unduly burdensome to create a separate bank account for each restricted donation. In other words, a nonprofit would deposit donations, including restricted donations, into one bank account and then account for restricted donations and their purposes in its own records. Only permanently restricted donations would be in separate bank or investing accounts. There would also be nothing improper in FOP placing unrestricted donations in a general fund or membership fund.

¶ 154    In Terpstra's experience with nonprofits, it is not uncommon for nonprofits to use professional fundraisers when they do not have their own fundraising department. Some fundraisers for nonprofits Terpstra worked with charged a flat fee, some an hourly rate, and some a percentage of the funds raised. Some working on a percentage basis charged high percentages because they were "no-risk" fundraising programs where the nonprofit bears no risk of loss and spends no money "out of pocket" even if the fundraiser raises little money. The fundraiser pays all expenses including paying the individual solicitors. Where fundraising is not done on a no-risk basis, a nonprofit can lose money on an unsuccessful campaign.

¶ 155    On examination by Callan, Terpstra testified that an 80% fundraising fee—that is, the nonprofit receives 20% of all donations—is reasonable for campaigns similar to FOP's.

¶ 156    On cross-examination, Terpstra testified that he testified on direct examination that FOP provides financial planning, retirement planning, insurance, scholarships, and home-buying assistance based on various documents including financial statements and tax returns. His statement that FOP provides disability insurance was based on the Letter without other confirmation, and he was unaware that the police pension board provides disability benefits rather than FOP. Terpstra saw "several different versions of the scripts" given to solicitors, "[p]robably three," that "describe the nature of the FOP organization, the environment in which it operates, and general purposes outlined in the articles of incorporation and bylaws." FOP's constitution was filed with the state and established the basis or authority for FOP's activities, while federal law establishes whether those activities are tax-exempt. If an organization such as FOP engaged in an activity outside its constitution or articles of incorporation that was not tax-exempt, it would generally have to file a form for taxable income of a nonprofit.

¶ 157    Terpstra's opinion that FOP's financial statements fairly represent the donations that it received was based on an audit by FOP's accounting firm of FOP's financial statements. He relied on that audit rather than conducting one himself, explaining that an audit is the highest level of scrutiny or assurance by an accounting firm. He did not review how the firm conducted the audit but relied on his knowledge as a CPA of how audits of nonprofits are conducted, and he did not know if the firm contacted donors. When asked if it would affect his analysis of whether funds donated to a nonprofit should be restricted for a particular purpose if he as an auditor was told by a donor that the nonprofit raised money for a particular purpose and the donor sent money to the nonprofit for that purpose, Terpstra replied that "the only manner in

which an auditor would contact the donor would be through confirmation letters," which he did not know whether the accounting firm did here, and "[o]nly a donor can place a restriction on a contribution, not the organization itself," so that an auditor would look for "any written restrictions placed by a donor on the contribution." When asked about Barski's deposition testimony that he believed more than about four complaints arose from Callan's contractor but he could not prove it and the ones Barski did prove resulted in termination, Terpstra replied that he had no opinion on Barski's deposition.

¶ 158    The management of a nonprofit is "responsible for establishing a system of internal controls to mitigate fraud risk." When asked if it is the responsibility of a nonprofit to provide an auditor sufficient information to determine if donations were properly characterized as restricted or unrestricted, Terpstra replied that an "auditor is responsible for reviewing the documentation that the auditor's professional judgment is deemed necessary to determine that the amounts are properly classified." Auditors can get that documentation from the nonprofit and can choose to send confirmation letters to donors. When asked if the audit being conducted according to generally-accepted principles precludes the financial statements from being "substandard and misleading," Terpstra replied "I have not seen any evidence in this matter that anybody says that they weren't" and that, in his experience, "the vast majority of audits are properly performed." When asked if there was any indication that FOP audited the funds from Telemarketers, he replied that "FOP wouldn't be performing any audits." FOP listed fundraising in its returns, but he could not recall if it listed its fundraising as special events.

¶ 159    Terpstra could not show where in his written opinion he indicated he read the contracts, but it was not one of his opinions that he reviewed the contracts. It was his understanding that FOP was using professional fundraisers, but he could not recall if donors were writing checks to FOP or Telemarketers. The Letter told donors to send donations to an address that was not FOP's offices but appeared to be because it was under FOP's name. He could not recall where donations went first. He did not audit Telemarketers' expenses because that was not what he was hired to do. When asked if a donation is unrestricted unless the donor documents a restriction in writing, he replied that a restriction must be documented but a sound recording would suffice. He was unaware whether Callan's contractors were recording their calls to potential donors, and merely stating a restriction orally in an unrecorded telephone call would not suffice to render a donation restricted. Terpstra agreed with a statement in a guide for nonprofit accounting that he participated in drafting:

> "Segregating funds to account for donor restrictions is unique to not-for-profit organizations and their underlying not-for-profit accounting. Good management requires that an organization be able to account accurately for restricted funds. Furthermore, the directors have a fiduciary responsibility to maintain the integrity of restricted funds."

Restricted funds can be deposited into the same bank account as unrestricted funds so long as they are accounted for separately in the organization's records and spent only on the restricted purposes. Except for large donations, a promise to donate would not necessarily be recorded until the donation was made, but a note would be made of the promise. Terpstra was unaware of any such notes here.

¶ 160                          E. Judgment

¶ 161      On June 14, 2019, the court issued its judgment. In reciting the allegations of the complaint as amended and describing the parties, the court referred to both individual plaintiffs as disabled police officers and FOP members at all relevant times and stated that FOP's services to its members include collective bargaining and providing representation in grievance and disability proceedings but also providing insurance and providing scholarships to members' children and promoting community and fraternity among its members with parties, tournaments, and "financial support to officers in time of need" such as illness in the family. The court stated that FOP members pay dues, except that disabled officers do not pay dues but are still FOP members and that Callan had been working with FOP before the instant contracts, including on fundraising since 1998. Lastly, the court stated that Safety Publications, Herdman, and Olivera were in default in case No. 03-CH-5765 and Public Awareness, Valentine, Chenault, Dugo, Brown, and Gentile were in default in case No. 03-CH-10108.

¶ 162                        1. Findings of Fact

¶ 163      The court recited that it carefully considered all testimony and evidence, and "if any of the Court's findings are contrary to a particular witness' testimony, the Court has specifically rejected the contrary testimony as being either not credible or simply unconvincing." The July 2000 agreements between FOP and Callan were renewals of agreements between them since 1998. Pursuant to the 2000 agreements, Callan subcontracted with Safety Publications and Public Awareness to perform telemarketing solicitation, the former under the agreement for individual fundraising and the latter under the agreement for business fundraising. Each subcontract provided that it did not create an agency relationship, as neither subcontractor could enter into contracts or agreements on Callan's behalf and each subcontractor was responsible for its own expenses.

¶ 164      "To ensure the uniformity of the message that was being conveyed by the telemarketers," FOP treasurer Barski and president Nolan "travelled to Callan's headquarters to collectively draft telemarketing scripts for the individual and business fundraising campaigns." The script for individual fundraising, but not the business script, warned solicitors to not misrepresent FOP, give the impression they were selling anything but sponsorships, or promise favors on pain of being discharged and prosecuted, and to recite the script verbatim. FOP and Callan presented evidence that the solicitors for business fundraising were also instructed to recite their script verbatim. While both scripts mentioned supporting FOP and its programs for its members, neither script solicited donations for disabled officers or families of deceased officers.

¶ 165      Under both campaigns, each donor would receive the Letter drafted jointly by FOP and Callan that in part recited that FOP is not a charitable or philanthropic organization and "FOP attempts to alleviate those concerns to some extent for Chicago officers and contribute to a measure of security for families through legal defense fund, accident, death and disability insurance, line of duty death benefits, legal services, dependent scholarships and legislative representation." The Letter did not solicit donations for disabled officers or families of deceased officers. While about 70,000 individuals and businesses donated to FOP from 1998 to 2003, six donors had testified, and their individual donations totaled $250.

¶ 166                                    2. Conclusions of Law

¶ 167        The court noted that plaintiffs alleged that Telemarketers were FOP's agents, while FOP
       and Callan argued that Callan was not FOP's agent nor was Safety Publications or Public
       Awareness Callan's agent pursuant to express provisions of the 2000 agreements and the
       subcontracts. After noting that agency can be actual or implied, and a party can be an agent or
       an independent contractor of another party, the court found that plaintiffs failed to establish at
       trial that FOP, Callan, Safety Publications, or Public Awareness had an agency relationship.
       Beyond the express terms of the 2000 agreements disclaiming agency,

              "evidence did not show that FOP had control over Callan and its subcontractors. FOP
              did not suggest, offer instruction or vet Callan's decision concerning who Callan should
              hire as subcontractors to carry out the actual solicitations. FOP never provided any
              oversight concerning the site inspections or how Callan conducted the fundraising
              campaign. Instead, FOP relied on Callan's expertise in fundraising to organize and
              carry out the FOP's telemarketing campaigns."

       FOP paid Callan a percentage of the funds raised, Callan was responsible for paying all
       fundraising costs, and the evidence was that "FOP's interactions with Callan were limited to
       ensuring that the fundraising conformed to FOP's expectations" by participating in preparation
       of the scripts and Letter.

¶ 168        There were limited interactions afterwards, including Barski contacting Callan and its
       subcontractors regarding complaints of improper solicitations. In his investigation, Barski told
       Valentine of Public Awareness to fire any of its solicitors who made unauthorized
       representations and told Callan to tell its subcontractors to "knock it off" before concluding
       after "a thorough investigation" that most of the complaints were unrelated to FOP's
       campaigns. The next FOP treasurer had even less interaction with Telemarketers, not
       discussing any complaints with them nor examining Callan's reports due to Callan's
       relationship with FOP.

¶ 169        The court found no apparent agency relationship between FOP, Callan, and its
       subcontractors. Because Callan did not directly contact donors, it made no representations to
       them. Moreover, donor testimony did not establish a reasonable belief that Callan or its
       subcontractors were FOP's agents; no individual donor testified to recalling receiving the
       Letter, and the business script required solicitors to state that they worked for Public Awareness
       conducting a fundraising campaign on behalf of FOP.

¶ 170        The court also found no express or apparent agency relationship between Callan and its
       subcontractors, as the subcontracts expressly provided that the subcontractors were
       independent with the subcontractors expressly not subject to Callan's control and expressly
       unable to bind Callan or make representations on Callan's behalf, and the subcontractors were
       each responsible for its own expenses. The court found that Callan's actions were consistent
       with the subcontracts and did not demonstrate such control over the subcontractors as to create
       agency. Also, the donor testimony did not establish a reasonable belief that the subcontractors
       were Callan's agent. Moreover, "the credible evidence made clear to the Court that Callan did
       not authorize its subcontractors to ever indicate that the funds that were solicited would be
       used solely for the purposes of helping disabled" officers or the families of deceased officers.

¶ 171        As to the claim of a charitable trust, plaintiffs alleged that FOP raised funds exclusively on
       behalf of plaintiffs and the Class and failed to remit the funds to them, while FOP and Callan
       argued that FOP's fundraisers were for the benefit of all FOP members. The court found that

the "entirety of Plaintiffs' charitable trust claim turns on the expressed intent of the six (6) donors who testified at trial and their respective intentions to exclusively benefit the Plaintiffs' classes with their donations." A charitable trust not based on a writing must be established by clear and convincing evidence, and the court found that plaintiffs failed to establish by clear and convincing evidence that the testifying donors intended to create a charitable trust. Four individual donors testified to not recalling the representations made during the solicitations, none testified to expressing to the solicitors an intent to donate exclusively for the Class, and none recalled receiving the Letter after expressing an intent to donate to FOP.

¶ 172    While Owens testified to making two donations to "help families of fallen officers and disabled officers of the City of Chicago," she could not recall where she sent her payment or whether she received the Letter, nor did she tell the solicitor how she wanted her donation spent. Barker testified that he received two calls soliciting money for disabled officers and families of fallen officers and then made donations in 2002 for "injured policemen or for the families of dead policemen killed in action" but could not recall if he donated to FOP, how he paid his donation, where he sent it, or if he received the Letter, nor did he testify to asking any questions of or making any assertions to the solicitors as to how his donation would be spent. In sum, the scripts and Letter established that the funds were for the benefit of FOP and its members generally, and plaintiffs failed to establish otherwise. No evidence of donor intent was presented regarding the business fundraising campaign.

¶ 173    As to unjust enrichment, plaintiffs proceeded on the theory that defendants engaged in wrongful conduct. However, plaintiffs failed to establish wrongful conduct by FOP or Callan for either charitable trust or unjust enrichment claims. FOP and Callan worked together to prepare scripts and a Letter with no misleading representations, and each expected that the subcontractors would follow the scripts. Barski's investigation established that FOP was diligent in ensuring the propriety of its fundraising campaigns against misrepresentations. Olivera and Herdman of Safety Publications testified that FOP never told them to vary from the script. The funds raised were used for FOP to provide various services to its members, including golf and fishing tournaments that promoted fraternity and community among its members.

¶ 174    As to constructive trust claims, the court found that plaintiffs failed to present clear and convincing evidence to warrant establishing a constructive trust because "there was no evidence that FOP, at any time, misled donors into contributing to the fundraising campaign."

¶ 175                                              3. Defaults

¶ 176    As to the effects of defaults by various parties, the court recited that a court may require proof of the allegations in the pleadings against a defaulting party, and a default admits well-pled facts alleged in a complaint but not conclusions a plaintiff draws from those facts. The court found that admitting the defaults as evidence against FOP and Callan would subject them to a higher burden merely because parties outside their control defaulted.

¶ 177    The court noted that plaintiffs presented evidence against defaulting parties. Chenault's affidavit admitted that the script was not strictly adhered to, Chenault and his solicitors told donors that FOP would use the funds to benefit the Class, and in making their calls hundreds of times each week between 1998 and the end of 2003 they never told donors that their money would be used for political donations, golf outings, or fishing tournaments. Indeed, they told

donors between 1998 and May 2001that their donations would benefit the Class.

¶ 178   Based on requests to admit against Public Awareness, Chenault, Valentine, Dugo, Brown and Gentile, judicial admissions were made by said parties. FOP through Callan hired Public Awareness to raise funds for plaintiffs. Public Awareness was raising funds for plaintiffs, told the public donations would benefit plaintiffs, and did not inform the public of the 78-22 split, and the public relied on Public Awareness's statements and gave donations expecting them to benefit plaintiffs. In other words, the donors listed on the donor sheets donated to benefit plaintiffs. Public Awareness raised additional funds that were unaccounted for and raised $2,606,078.54 on behalf of plaintiffs, none of which was distributed to or benefited plaintiffs, nor did Public Awareness create a fund to benefit the Class. The court found that Public Awareness, Valentine, Chenault, Dugo, Brown, and Gentile received $2,143,234.96 from their solicitations.

¶ 179   As to Safety Publications, Herdman, and Olivera, the court found them liable upon the allegations of the complaint as amended, noting additionally their failure to appear at trial pursuant to Rule 237. The court found that the evidence against Safety Publications, Herdman, and Olivera "clearly established that damages were incurred," and they received $1,454,921.63 from their solicitations.

¶ 180                                              4. Summary

¶ 181   The court found for FOP and Callan in both cases. It found for plaintiffs in case No. 03-CH-5765 for $1,454,921.63 against Safety Publications, Herdman, and Olivera, and in case No. 03-CH-10108 for $2,143,234.96 against Public Awareness, Valentine, Chenault, Dugo, Brown, and Gentile. Each was "enjoined from disbursing, transferring, expending or liquidating any funds, assets, bank accounts without court approval and from transferring, selling or encumbering any assets or property" until the judgment applicable jointly and severally to him or it was satisfied.

¶ 182                                            III. ANALYSIS

¶ 183   On appeal, plaintiffs contend that the trial court erred in (1) finding no agency relationship between FOP and Telemarketers or amongst Telemarketers; (2) not imposing a charitable trust; (3) finding no wrongful conduct by FOP and not imposing a constructive trust; (4) not finding that FOP and Callan breached their duties as trustees over the donations by wasting, mismanaging, and commingling funds; and (5) finding no unjust enrichment. Because of how these contentions affect each other, we shall consider agency, then wrongful conduct and constructive trust, and then the unjust enrichment and charitable trust claims.

¶ 184                                        A. General Principles

¶ 185   In a bench trial, the court as trier of fact is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive. *Doherty v. Country Faire Conversion, LLC*, 2020 IL App (1st) 192385, ¶ 54. The credibility of witnesses and the weight to be given their testimony are matters for the trier of fact, and we will not substitute our judgment, though testimony that is so inherently improbable as to be contrary to common experience may be rejected. *Aliano v. Transform SR LLC*, 2020 IL App (1st) 172325, ¶ 21. When the trial court's findings of fact depend upon witness credibility, we defer to those

- 38 -

findings unless they are against the manifest weight of the evidence. *Id.* A factual finding is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent or the findings are unreasonable, arbitrary, or not based on the evidence. *Id.*; *Doherty*, 2020 IL App (1st) 192385, ¶ 54.

¶ 186    When some but not all defendants are in default, a default judgment entered against the defaulting defendants is not an admission by the nondefaulting defendants of a disputed evidentiary matter, and nondefaulting defendants may contest a fact that a defaulting defendant has admitted by that default. *American Access Casualty Co. v. Griffin*, 2014 IL App (1st) 130665, ¶ 29. In other words, an admission attributable to defaulting defendants cannot be attributed to the nondefaulting defendants. *Id.*

¶ 187    Judicial admissions are deliberate, clear, and unequivocal statements by a party about a concrete fact within the party's knowledge. *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 37. They are formal concessions in the pleadings or stipulations that have the effect of withdrawing a fact from issue and dispensing with the need to prove that fact. *Id.* Judicial admissions are conclusively binding on a party and may not be contradicted in a motion for summary judgment or at trial. *Id.* Legal issues cannot be judicially admitted. *Id.* Courts will not apply judicial admissions to bar a claim or defense when there was other evidence to support the claim or defense. *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 64. A trial court's treatment of a judicial admission is reviewed for an abuse of discretion and will be reversed only if no reasonable person would take the trial court's view. *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 118.

¶ 188                                B. Agency

¶ 189    Plaintiffs contend that trial court erred in finding no agency relationship between FOP and Telemarketers or amongst Telemarketers.

¶ 190    Agency is a consensual fiduciary relationship between two parties where the principal has the right to control the activities of the agent and the agent has the power to affect the principal's legal relations. *Retirement Plan for Chicago Transit Authority Employees v. Chicago Transit Authority*, 2020 IL App (1st) 182510, ¶ 54. The tests of agency are whether the principal has authority to control the method or manner of accomplishing a task by the agent and whether the agent has authority to subject the principal to liability. *Id.* An independent contractor is similarly defined by the level of control over the manner of work performance, as an independent contractor undertakes to produce a given result for another but exercises discretion in how to conduct the work " 'in things not specified' " and is not under the orders or control of that other. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004) (quoting *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 539 (1931)).

¶ 191    In determining whether one is an agent or independent contractor, the primary consideration is whether that person retains the right to control the manner of doing the work. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 44. Courts should also consider the following factors: (1) the question of hiring, (2) the right to discharge, (3) the manner of direction of the person at issue, (4) the right to terminate the relationship, and (5) the character of the supervision of the work done. *Id.* The presence of one or more factors is not necessarily conclusive, as the factors serve as guides to resolving the key question of whether the alleged agent is truly an independent contractor or is subject to control. *Id.* Requiring an independent contractor to follow certain policies and procedures does not by itself constitute sufficient

control to create an agency relationship. *Magnini v. Centegra Health System*, 2015 IL App (1st) 133451, ¶ 33. The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal. *Lawlor*, 2012 IL 112530, ¶ 44.

¶ 192     Here, the trial court concluded that Callan was not FOP's agent, and Public Awareness and Safety Publications were not Callan's agents, because the contracts clearly provided so and plaintiffs failed to establish otherwise. Indeed, the contracts are absolutely clear that Callan was not FOP's agent and that Public Awareness and Safety Publications were not Callan's agents.

¶ 193     As to establishing agency otherwise, there was conflicting evidence at best as to whether, and to what degree, FOP could control Callan, Public Awareness, or Safety Publications or Callan could control the latter two. There was evidence that the scripts provided to the solicitors were prepared cooperatively by Callan and FOP rather than FOP providing scripts to Callan. Similarly, there was evidence that Callan prepared the Letter based on its experience and presented it to FOP for signature by its officials. An FOP official visited the facilities of Public Awareness or Safety Publications only once, and a Callan official visited a few times in a period of about four years. There was some evidence of oversight or feedback, albeit infrequent. FOP's Barski complained to Callan or Public Awareness about improper solicitations, Callan similarly complained, and Barski asked a few times for solicitors to be terminated if he had confirmed reports of improper solicitation. However, it was not clear whether Callan and Public Awareness had treated these as requests from a client or orders from a principal. Moreover, Barski testified that he did not believe he could do more unless the complaints he received were borne out, which is not consistent with FOP having a right to discharge. In sum, applying the factors listed above, there was no evidence FOP or Callan had control over hiring, ambiguous evidence of whether either had a right to discharge, sporadic and remote direction of the solicitors by FOP or Callan, and clear evidence that Callan's supervision of the soliciting work was infrequent and FOP's was rare. On such evidence, neither conclusion (agency or not) is clearly apparent, and we cannot find the trial court's conclusion to be against the manifest weight of the evidence.

¶ 194     In addition to finding no actual agency, the trial court found no apparent agency. Apparent authority exists when a principal has created the appearance of authority in an agent and another party has reasonably and detrimentally relied upon the agent's authority, so that the principal cannot deny it. *1550 MP Road LLC*, 2019 IL 123046, ¶ 42. Stated another way, apparent agency exists when the purported agent lacks actual authority from the purported principal but the latter makes some representation or manifestation to a third party or the general public that gives a reasonable impression that the former is an agent with actual authority. *Bosch v. NorthShore University Health System*, 2019 IL App (1st) 190070, ¶ 87. A party alleging the existence of an apparent agency relationship must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal, (2) the principal had knowledge of and acquiesced in the acts of the agent, and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence. *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 76.

¶ 195     Here, the trial court found that Callan was not FOP's apparent agent in part because Callan made no representations to third parties or the public. However, as plaintiffs note, apparent agency would also be shown if FOP, as the purported principal, made representations that

could be reasonably interpreted as a grant of authority. The representations FOP made to the public—or more precisely the portion of the public that was solicited in FOP's campaigns—were in the scripts and Letter. Both indicated that the solicitors were not with FOP but were professional fundraisers. Indeed, the Letter identified Callan (as coordinator on the individual campaign and publisher on the advertising campaign) and Public Awareness or Safety Publications. Thus, FOP did not make or authorize any misrepresentations.

¶ 196    As to FOP's knowledge of and acquiescence to solicitor's misleading solicitations, the evidence was conflicted. Barski's testimony reasonably established that FOP did not acquiesce to misleading solicitations, as he investigated complaints of such solicitations and acted where he believed he could but also established that FOP knew misleading solicitations were being made. That said, it is not clear that FOP knew there was a significant problem, as FOP was also aware that misleading solicitations were being made on behalf of other organizations. Indeed, Barski was clear that he tried to confirm that complaints he received related to FOP's campaigns but established so in only a handful of cases. Thus, it would be reasonable to conclude on this evidence that FOP was aware of a minor problem with misleading solicitations on its behalf and acted against the problem it was aware of rather than acquiescing to it.

¶ 197    As to the third factor, the court found that the trial evidence did not establish donors' reasonable belief that Callan or its contractors were FOP's agent. Again, the evidence was conflicted. While the Letter was clear that FOP was using professional fundraisers, the donors who testified many years after the solicitations at issue did not recall receiving it nor did they establish that they did not receive it.

¶ 198    Considering all three elements of apparent agency, we conclude that the court's finding of no apparent agency was not against the manifest weight of the evidence.

¶ 199    As the trial court found no agency based in significant part on the contracts, plaintiffs contend that the contracts were void *ab initio* and thus the court could not rely on them for any purpose. When a party lacks the legal authority to form a contract, the resulting contract is void *ab initio*. *1550 MP Road LLC*, 2019 IL 123046, ¶ 28. The question of a contract's validity is a matter of law. *Id.* ¶ 38. Contracts have been deemed void *ab initio* when the subject matter is illegal, such as gambling contracts, or when a party did not have the authority to enter into the contract. *Deutsche Bank National Trust Co. v. Hart*, 2016 IL App (3d) 150714, ¶ 40.

¶ 200    Plaintiffs argue that the contracts are void for violating the Charity Act and because FOP's bylaws forbid using its name or logo in fundraising. We may quickly dispose of the first claim by noting that fundraising, the subject of the Charity Act and the contracts at issue, is not an illegal subject matter. As to the claim that FOP lacked authority to enter into the contracts, plaintiffs are correct that FOP's bylaws provide that "[a]ny member may be disciplined for committing any one or more of the following offenses: *** [u]sing the name and/or logo of this Lodge or the Fraternal Order of Police for soliciting funds or advertising or similar activities except as provided elsewhere in this Constitution and By-Laws." Plaintiffs note that no other provision in the constitution or bylaws expressly authorizes using FOP's name or logo for fundraising or advertising. However, the bylaws also provide that the FOP president "shall execute *any and all* contracts that may be authorized by the Board of Directors." (Emphasis added.) We interpret the first clause as a prohibition on FOP *members* using FOP's name or logo for fundraising or advertising without FOP permission and the latter clause as broad authority for FOP as an *organization* to contract with board approval, encompassing

contracting to use FOP's name or logo for fundraising or advertising. Absent any evidence that the board did not approve the FOP-Callan contracts, we see no lack of authority under the FOP constitution and bylaws. We therefore find no basis for declaring the contracts at issue void *ab initio*.

¶ 201                                                    C. Constructive Trust

¶ 202     Plaintiffs contend that the trial court erred in finding no wrongful conduct by FOP or Callan and by not imposing a constructive trust.

¶ 203     A constructive trust is an equitable remedy available to redress unjust enrichment. *National Union Fire Insurance Co. of Pittsburgh, PA v. DiMucci*, 2015 IL App (1st) 122725, ¶ 75. A constructive trust is imposed for (1) actual or constructive fraud; (2) a fiduciary duty and subsequent breach of that duty; or (3) duress, coercion, or mistake. *Id.* ¶ 77. That is, " '[w]hen a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment.' " *Id.* ¶ 76 (quoting *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 299 (2000)). Thus, while wrongful or unconscionable conduct is generally a prerequisite to imposing a constructive trust, it is not an essential element. *Id.* ¶¶ 75-76.

¶ 204     " 'Constructive trusts are divided into two general classes: one in which actual fraud is considered as equitable grounds for raising the trust, and the other, where there exists a fiduciary relationship and subsequent abuse of such relationship.' " *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 19 (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 293 (1986)). A fiduciary relationship may be created as a matter of law, as with an agent and principal, or a matter of fact.[1] *Id.* ¶ 20. A fiduciary relationship as a matter of fact exists if one party places special trust and confidence in another who accepts that trust and confidence and thereby gains superiority and influence over the first party. *Id.* ¶ 21. Significant dominance and superiority, consisting of the ability to exercise undue influence, is necessary to establish a fiduciary relationship as a matter of fact. *Id.* ¶ 22. Thus, a fiduciary relationship is not created merely because the parties have engaged in business transactions or have a contractual relationship nor merely because one party trusts the other. *Retirement Plan for Chicago Transit Authority Employees*, 2020 IL App (1st) 182510, ¶ 59. A fiduciary relationship as a matter of fact must be shown by clear and convincing evidence. *Doherty*, 2020 IL App (1st) 192385, ¶ 42.

¶ 205     The imposition of a constructive trust is generally a matter for the trial court's discretion, which we reverse for an abuse of discretion. *National Union Fire Insurance Co.*, 2015 IL App (1st) 122725, ¶ 78; *Tummelson*, 2015 IL App (4th) 150151, ¶ 34. However, if the issue is whether there was a legal basis for the court's order, our review is *de novo*. *National Union Fire Insurance Co.*, 2015 IL App (1st) 122725, ¶ 78.

¶ 206     Here, taking the grounds for declaring a constructive trust out of order, there was no basis for finding an abuse of a fiduciary relationship. Plaintiffs did not allege a fiduciary relationship between plaintiffs and any defendant other than FOP. Even if there was a fiduciary relationship between FOP and plaintiffs—allegations the trial court repeatedly dismissed—there was no evidence to show that FOP abused the relationship, as we shall explain in the following

---

[1] Other fiduciary relationships by law—attorney-client, guardian-ward, and partners or joint venturers—exist. *Doherty*, 2020 IL App (1st) 192385, ¶ 42. They are not relevant here.

paragraphs.

¶ 207    What remains are plaintiffs' allegations of wrongdoing. There was indeed evidence of wrongdoing in the form of misleading representations by solicitors working for Public Awareness and Safety Publications. However, FOP and Callan were not responsible for that wrongdoing on a principal-agent basis because the trial court correctly found no agency relationship.

¶ 208    Plaintiffs point to the Letter as a misleading representation by FOP, but the court was not required to accept at face value plaintiffs' argument or Cohen's opinion that the reference to the harsh realities of law enforcement was a promise to spend the money raised on the Class. As some witnesses—including a donor—testified, the harsh realities of law enforcement are not limited to death or disability. The broad statement in the Letter does not become more specific merely because someone outside of FOP's control made specific misrepresentations. The court was also not required to accept Cohen's opinion that any reference by FOP to how donations would be spent that was in any way incomplete or not utterly comprehensive would, by itself, limit FOP to spending the money raised on only the purposes or programs expressly mentioned.

¶ 209    Plaintiffs point to the structure of the campaigns—specifically, that Telemarketers retained about 80% of all funds raised and FOP received about 20%—as wrongdoing. Again, the court did not have to accept plaintiffs' claim, especially where there was evidence from James and Terpstra that an 80-20 division was not unusual. Terpstra explained the virtues of a no-risk fundraising arrangement where the nonprofit has no out-of-pocket expenses and does not run the risk of actually losing money if the campaign is unsuccessful. Also, while the Letter did not state that 80% of the funds raised would be kept by Telemarketers, it did disclose that the revenue raised would pay marketing and administrative costs as well as generating income for FOP.

¶ 210    Plaintiffs point to FOP placing the money raised into a general fund and spending it on expenses such as golf and fishing tournaments instead of the Class as another instance of wrongdoing. However, this places the cart before the horse: if FOP was not obligated to spend the money on the Class alone, then placing the money in the general fund and spending it on general expenses of FOP was not by itself wrongful. In the Letter, FOP made a clear representation that it is a membership organization rather than a charitable organization. Plaintiffs claim that FOP made a judicial admission that "the funds were not raised or administered for any of its members." However, FOP's repeated discovery response that it "did not use any fundraiser to solicit funds for its members" is not reasonably interpreted as an admission that the funds raised did not benefit any FOP members but a quibble with the proposition that FOP used a fundraiser. We do not consider it a clear and unequivocal statement by FOP to the effect that plaintiffs wish to use it.

¶ 211    We find that the court did not abuse its discretion in concluding that neither FOP nor Callan obtained money to which they were not entitled, under such circumstances that in equity and good conscience they ought not retain the money, so that the court did not create a constructive trust.

¶ 212                                    D. Unjust Enrichment

¶ 213        Plaintiffs contend that the trial court erred in finding no unjust enrichment.

¶ 214        To prevail on a claim for unjust enrichment, a plaintiff must show that the defendant retained a benefit to the plaintiff's detriment and that this retention violates fundamental principles of justice, equity, and good conscience. *Hatcher v. Hatcher*, 2020 IL App (3d) 180096, ¶ 15. Where the benefit was transferred to the defendant by a third party, a claim for unjust enrichment exists when (1) the benefit should have been given to the plaintiff but the third party mistakenly gave it to the defendant, (2) the defendant procured the benefit from the third party through wrongful conduct of some kind, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant. *Id.*

¶ 215        Here, plaintiffs again argue wrongful conduct or wrongdoing, which we addressed above. We find that denial of the unjust enrichment claims against FOP and Callan was not against the manifest weight of the evidence.

¶ 216                                     E. Charitable Trust

¶ 217        Plaintiffs also contend that the trial court erred in not imposing a charitable trust.

¶ 218        A charitable trust is a fiduciary relationship regarding property arising from manifestation of an intention to create it, subjecting the person holding the property to equitable duties to deal with the property for a charitable purpose. *Eychaner v. Gross*, 202 Ill. 2d 228, 253 (2002). Creation of a charitable trust requires all of the following: (1) intent of the parties to create a trust, which may be shown in the absence of a declaration of trust by circumstances showing that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee. *Id.* at 253-54. The primary focus in determining the existence of a trust is whether the settlor intended to establish a trust at the time the trust is alleged to have been created. *Id.* at 254. A trust will not arise unless there is an outward expression of the settlor's intention at the time of the trust's purported creation. *Id.* That manifestation of intent may appear clearly from written or spoken words or may be determined by interpretation of the settlor's words or conduct in the light of all the circumstances. *Id.* at 255. A trust not based on a declaration must be established by clear and convincing evidence, and the acts or words relied upon must be so unequivocal and unmistakable as to lead to only one conclusion. *Id.* at 260.

¶ 219        Here, the trial court correctly concluded that the evidence of an intent to create a charitable trust was not clear and convincing. Firstly, no donors to the advertising campaign testified, and only a handful of individual donors testified. Secondly, while some recalled being told that the money would be spent on disabled and deceased officers and testified that they would not have donated otherwise, some testified that their impression of the FOP's purpose and the purpose of the donations was derived from various solicitations including ones not for FOP's campaign. Lastly, there was no evidence that any donors expressed an intent to restrict his or her donation.

¶ 220                                  F. Trustee Over Donations

¶ 221        Plaintiffs also contend that the trial court erred in not finding that FOP and Callan breached their duties as trustees over the donations by wasting, mismanaging, and commingling funds. However, we found for the reasons stated above that no constructive or charitable trust was

created, so there were no trustee duties for FOP or Callan to breach.

¶ 222                                   IV. CONCLUSION.
¶ 223        Accordingly, we affirm the judgment of the circuit court.

¶ 224        Affirmed.

¶ 225        PRESIDING JUSTICE MIKVA, specially concurring:

¶ 226        I join the majority's opinion because I agree that it correctly analyzes of all the legal issues and gives appropriate deference to the trial court's fact-finding. I also agree that the trial court judge in this case carefully, thoroughly, and accurately considered the evidence before him and ruled appropriately.

¶ 227        I write separately to stress that, although FOP and Callan avoided liability in this case, this court's decision should not be read as an endorsement of the tactics used by the Telemarketers to lure generous donors into giving, under the mistaken impression that they were helping injured police officers or the families of officers killed in the line of duty. Nor should it be read as approving of the increasingly widespread tactic of potential tortfeasors benefitting from the wrongdoing of "independent contractors," while avoiding liability for the actions of those individuals by disclaiming any right to control them.

¶ 228        FOP made hundreds of thousands of dollars through this venture—with no monetary investment—and Callan made millions. The thousands of donors persuaded to give generously to the FOP were likely unaware that almost 80% of their contributions would be retained by the Telemarketers or that no members of the plaintiff class would ultimately benefit from those donations. The plaintiffs and lawyers who brought these class actions doggedly sought a remedy for this injustice for almost 20 years. But in a troubling and all-too-common turn of events, the defendants who were found liable were likely judgment-proof and the deeper pocketed defendants who benefitted from their conduct were shielded from liability by the fact that those other defendants were "independent contractors," as defined by the common law.

¶ 229        Our legislature has seen fit in the past to alter the common law standards governing independent contractor status through targeted legislation affecting a particular industry. See *Bartlow v. Costigan*, 2014 IL 115152, ¶¶ 20, 54 (rejecting constitutional challenges to the Employee Classification Act (820 ILCS 185/1 *et seq.* (West 2010)), enacted in 2008 to address the misclassification of employees as independent contractors in the construction industry, and which "broadly provides that any individual 'performing services' for a construction contractor is 'deemed to be an employee of the employer' " (quoting 820 ILCS 185/10(a) (West 2010))). The facts of this case suggest that the telemarketing industry may also be a candidate for such special treatment.

¶ 230        For these reasons, I specially concur.

¶ 231        JUSTICE ODEN JOHNSON joins in this special concurrence.